RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0184p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

In Re: CLASSICSTAR MARE LEASE
LITIGATION

————————————————————

WEST HILLS FARMS, LLC, ARBOR FARMS,
LLC, NELSON BREEDERS, LLC, MACDONALD
STABLES, LLC, JASWINDER GROVER,
MONICA GROVER,

        *Plaintiffs-Appellees*,

   *v.*

CLASSICSTAR FARMS, INC., GEOSTAR
CORPORATION, TONY P. FERGUSON,
CLASSICSTAR 2004, LLC, THOMAS E.
ROBINSON (12-5467); JOHN W. PARROTT (12-
5475),

        *Defendants-Appellants*.

No. 12-5467;12-5475

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
Nos. 5:06-cv-00243; 5:07-cv-00353—Joseph M. Hood, District Judge.

Argued: March 14, 2013

Decided and Filed:  July 18, 2013

Before:  MERRITT, CLAY, and GRIFFIN, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Kannon K. Shanmugam, WILLIAMS & CONNOLLY LLP, Washington,
D.C., for Appellants.  Barry D. Hunter, FROST BROWN TODD, Lexington, Kentucky,
for Appellees in 12-5467 and 12-5475 **ON BRIEF:** Kannon K. Shanmugam,
WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellants.  Barry D. Hunter,
FROST BROWN TODD, Lexington, Kentucky, for Appellees in 12-5467 and 12-5475.

     CLAY, J., delivered the opinion of the court, in which GRIFFIN, J., joined.
MERRITT, J. (pp. 32–38), delivered a separate opinion concurring in part and dissenting
in part.

1

_____

**OPINION**

_____

CLAY, Circuit Judge.  This case arises from the fraudulent operation of an investment vehicle called the Mare Lease Program.  Plaintiffs, a group of investors, alleged that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), by convincing them to invest in the Mare Lease Program and related entities in order to take advantage of various tax deductions.  Little did Plaintiffs know that the assets which formed the basis of the touted tax deductions were dramatically undervalued and, in some cases, wholly fictitious.  After extensive discovery, Plaintiffs moved for summary judgment on their RICO claim as well as parallel state-law fraud and breach of contract claims.  The district court granted summary judgment to Plaintiffs on each claim and awarded damages of approximately $49.4 million and prejudgment interest in excess of $15.6 million.  Because we agree that the record reflects no genuine dispute over any material facts, we **AFFIRM** the district court's grant of summary judgment.

**BACKGROUND**

**A.     The Mare Lease Program**

In 1990, David Plummer created the Mare Lease Program to enable investors to participate in his horse-breeding business while taking advantage of the sizable tax benefits associated with raising horses.  Plummer, who operated the Mare Lease Program through a company named New Classic Breeders, LLC, was a nationally recognized expert in horse-breeding and the tax consequences of related investments.  Plummer encouraged investors to take advantage of a provision in the tax code which classified horse-breeding investments as farming expenses, entitling investors to a five-year net operating loss carryback period instead of the typical two years.  *See* 26 U.S.C. § 172(b)(1)(G).

An investor in the Program would lease a breeding mare from New Classic Breeders for a single season; the mare would be paired with a suitable stallion, and the investor could keep any resulting foals, which could then be either kept or sold. Investors could deduct the amount of their initial investment—which, unsurprisingly, tended to be based on the amount they wished to deduct for the previous five years—and also realize the gain from owning a valuable Thoroughbred foal. Investors were encouraged to hold their foals for at least two years before selling them, qualifying the sale for the much lower long-term capital gains tax rate. *See* 26 U.S.C. § 1231(b)(3)(A).

Between 2001 and 2005, the Mare Lease Program generated more than $600 million in revenue. The Program was aggressively marketed to wealthy individuals, who were assured that it was a reliable way to generate tax deductions and convert ordinary income into long-term capital gains. Accordingly, the economic success of the Program hinged on the investors' eligibility to receive the advertised tax benefits. To reassure investors that the Program's tax advantages were legitimate, they were given tax advice by two law firms hired by Defendants: Handler, Thayer, and Duggan, LLC, and Hanna Strader P.C. These firms and an accounting firm purported to have vetted the Mare Lease Program, and they opined that the investments would be fully tax deductible as promised.

### B.     The Scheme

GeoStar Corporation is a privately held company specializing in oil and gas exploration. By around 2000, GeoStar and its publicly traded affiliate, Gastar Exploration, Ltd., had acquired a number of undeveloped oil and gas properties, and they were looking for ways to raise capital to exploit these properties. GeoStar executives were introduced to David Plummer and the Mare Lease Program around that time, and in 2001, GeoStar acquired New Classic Breeders through a holding company it created named ClassicStar Farms, Inc., and it renamed the business ClassicStar, LLC ("ClassicStar"). David Plummer served as the president of ClassicStar Farms, Inc. until 2003, when he became GeoStar's director of marketing. After David Plummer moved

to GeoStar, his son Spencer Plummer became president of ClassicStar Farms. Together with GeoStar executives, including Defendants, they operated the Mare Lease Program.

In an effort to finance its undeveloped oil and gas properties, GeoStar encouraged Mare Lease Program investors to exchange their interests in the Program for interests in coalbed methane wells owned by GeoStar subsidiaries, as well as Gastar stock. GeoStar and ClassicStar told investors that they could take advantage of the five-year operating loss carryback period associated with their horse-breeding investments, and then quickly convert those investments into oil and gas interests that, unlike the foals, would not need to be held for two years before being sold. Investors were told that these transfers would be tax-free because they could deduct any gain from the conversion as intangible drilling costs associated with the development of the wells. *See* 26 U.S.C. § 263(c). In this way, GeoStar was able to channel investors' money through the Mare Lease Program into its oil and gas developments.

To further entice investors into the Mare Lease Program, ClassicStar arranged for a large part (usually half) of the initial investment to be financed through the National Equine Lending Company ("NELC"), which was represented to be "a national lender on approved credit." (R. 1701, Ex. 9, at 7.) Investors would deduct the entirety of their investment, including the loan, from their taxable income from the past five years.[1] Although it was consistently described as a third-party lender, NELC was in fact owned and operated by Gary Thomson, David Plummer's brother-in-law. Spencer Plummer told one of Plaintiffs' financial advisers that "we can control him [Thomson] and what he does," (R. 1701, Ex. 7, at 8,) but none of the investors was ever told that NELC had no funds of its own. ClassicStar provided all of NELC's funds and arranged sham three-way transactions in which funds were transferred from ClassicStar to NELC, loaned to an investor, and then paid back to ClassicStar as part of an investment in the Mare Lease Program. The purpose of these transactions was to make the Program

---

[1] For example, an investment of $2 million might consist of $200,000 in cash, $800,000 in a short-term loan from NELC that would be quickly repaid with the resulting tax refund, and a long-term loan of $1 million from NELC to be repaid with the profits from the Program. (R. 1701, Ex. 16, at 6.)

attractive to investors by allowing them to drastically increase their investments and, by extension, their tax deductions.

GeoStar and ClassicStar's efforts in promoting the Mare Lease Program were successful, so successful in fact that investors purchased interests in many more mares than were actually owned by ClassicStar. Although investors were repeatedly told that they were leasing actual horses, ClassicStar never owned anywhere near the number of horses purportedly being leased. Between 2001 and 2004, ClassicStar owned between $10 million and $56 million worth of mares, but sold an average of $150 million worth of mare lease packages during each of those years. (R. 1701, Ex. 23.) By the end of 2004, the difference between the value of the mares owned by ClassicStar and the value of the mare leases sold to investors was approximately $270 million. (R. 1701, Ex. 5, at 195–97.) To disguise the shortfall, ClassicStar substituted less valuable quarter-horses for Thoroughbreds and, in many cases, simply did not identify the horses that investors believed they were leasing.

To conceal the shortfall of mares and funnel money into their oil and gas interests, GeoStar and ClassicStar encouraged investors to exchange their mare leases for interests in various oil and gas properties. However, by mid-2003, these interests were also oversold. The tax deductions for intangible drilling costs used to entice investors out of the Mare Lease Program, like the mare lease deductions themselves, were dubious because they were based on fictitious assets, work that was never performed, and costs that were never expended.

Faced with a severe shortfall of assets in both the Mare Lease Program and their oil and gas programs, and no longer wishing to offer investors Gastar stock in exchange for their (largely worthless) interests in these other programs, GeoStar and ClassicStar created First Equine Energy Partners, LLC ("FEEP"). FEEP purported to offer investors a vehicle to combine equine interests—those contributed to the program by the investors themselves—with oil and gas interests to be contributed by GeoStar and its subsidiaries. (R. 1701, Ex. 68.) However, FEEP was never properly funded by GeoStar, and it owned either few assets or none at all. As one of Plaintiffs' experts testified, "FEEP as realized

by ClassicStar was merely another means to perpetuate the ruse that began with the Mare Lease Program in which ClassicStar failed to deliver mares to participants." (R. 1701, Ex. 9, at 65.)

As a result of the dramatic overselling of the Mare Lease Program, resulting in "investments" in horses that largely did not exist, coupled with the sham loans from NELC designed to artificially inflate the size of the investments and the illusory nature of FEEP, the IRS has since disallowed the investors' tax deductions.[2] Among the numerous problems with the Program was that investors had claimed deductions related to improperly inflated expenditures on assets that did not exist. The government also opened a criminal investigation into the scheme to facilitate fraudulent tax deductions. Because of their participation in the Mare Lease Program, David Plummer, Spencer Plummer, an accountant named Terry Green, and one of the Defendants in this case, John Parrott, each pleaded guilty to one count of conspiracy to defraud the United States.

### C.     The Defendants

GeoStar Corporation has its principal place of business in Mt. Pleasant, Michigan. Together, Thom Robinson, Tony Ferguson, and John Parrott own approximately 75% of GeoStar, as well as a controlling interest in Gastar, GeoStar's publicly traded affiliate. GeoStar acquired New Classic Breeders—later ClassicStar, LLC—through a holding company named ClassicStar Farms, Inc. ClassicStar and its employees thereafter acted as GeoStar's agents, with all fundamental financial and operational decisions made by GeoStar. Although Robinson and GeoStar had the final word on most financial matters, particularly with respect to the Mare Lease Program, ClassicStar managed its own employees. ClassicStar Farms, Inc. and ClassicStar 2004 had no operations or employees separate from ClassicStar, but each entered into contracts in its own name.

---

[2]The parties admit that the specific details of the government's disallowance of the tax deductions was not contained in the record before the district court. However, Plaintiffs have represented to this Court that the IRS has in fact disallowed all the deductions in question. *See* Appellees' Letter Br. 4.

Thomas Robinson was President and CEO of GeoStar and served as a co-manager of ClassicStar. By all accounts he had the final word on all fundamental decisions regarding ClassicStar's operations and finances, including its management of the Mare Lease Program. Robinson orchestrated the original acquisition of New Classic Breeders from David Plummer, and he then hired Plummer first as president of ClassicStar Farms, Inc., and then as GeoStar's head of marketing. Robinson also served as President and CEO of First Source Wyoming, a GeoStar affiliate, and Gastar; in those roles he directed the acquisition and development of oil and gas properties around the world. Finally, Robinson helped create FEEP, helped draft its private placement memoranda, and sat on its advisory committee.

Tony Ferguson was a vice president of GeoStar and co-manager of ClassicStar. He also served as Vice President of Operations at First Source Wyoming, as an owner and Executive Vice President of Gastar, and as tax partner and president of the manager of FEEP. Ferguson was actively involved in the marketing and promotion of the Mare Lease Program and the conversion of those interests into oil and gas interests. All questions related to the tax implications of the conversions went to Ferguson. He provided cover stories to investors when they inquired as to why they were not being assigned specific horses, and he was aware that less valuable quarter-horses were being substituted—sometimes only on paper—for Thoroughbreds in investors' mare lease packages. At one point, David Plummer "lamented the fact that Tony [Ferguson] was taking his money for horses and using it for something else, using it for gas." (R. 1701, Ex. 19, at 24–25.)

John Parrott was a vice president of GeoStar and a vice president of ClassicStar. Parrott reviewed and approved the marketing materials used by ClassicStar to promote the Mare Lease Program, including the attorney opinion letters that purported to confirm the legitimacy of the advertised tax deductions. He also either drafted or revised the language of the mare lease contracts themselves. Together with Robinson, Parrott helped draft the FEEP private placement memoranda and sat on its advisory committee.

When Parrott pleaded guilty to conspiracy to defraud the United States, he admitted the following facts:

> As Vice President of GeoStar Corp. between approximately 2001 and 2009, I assisted in the preparation of documents and other activities designed, pursuant to conversations and agreements with others, to allow taxpayers to take deductions to which they were not entitled, relating to their investments in the ClassicStar Mare Lease Program and related endeavors.

(R. 1701, Ex. 8, at 46.)

### D.     The Plaintiffs

Plaintiffs collectively invested approximately $90 million in the Mare Lease Program in 2003 and 2004. Each of them received some sort of presentation from ClassicStar describing the nature of the Program, including its tax advantages, expected return on investment, and unique financing structure. Each signed a mare lease agreement, made the appointed payments together with a loan from NELC, and later received a schedule purporting to list the mares and breeding pairs that ClassicStar had assigned to them. Each received a tax opinion letter from one of the two law firms associated with ClassicStar and GeoStar; Arbor Farms, West Hills Farms, and Nelson Breeders received advice from Hanna Strader, and the Grovers and MacDonald Stables received advice from Handler Thayer.

MacDonald Stables exchanged its interests in the Mare Lease Program for shares of Gastar stock and interests in FEEP. The Grovers converted their mare leases into interests in FEEP and other GeoStar subsidiaries. The remaining Plaintiffs each invested considerable sums in the Mare Lease Program, primarily financed through short- and long-term loans from NELC. Although Plaintiffs received the value of some of the foals they were promised, the return never approached the amount of their investments because of the absence of a sufficient number of horses in the Program. After adding their out-of-pocket losses to the amount of the fraudulently obtained tax deductions that Plaintiffs must repay to the IRS, Plaintiffs' collective losses totaled $16,468,603.87. (R. 2267-1.)

On July 28, 2006, Plaintiffs filed a complaint in the United States District Court for the Eastern District of Kentucky, alleging twenty-eight counts against twenty-three defendants, including federal RICO claims, violations of federal and state securities laws, common-law fraud, breach of contract, negligent misrepresentation, unjust enrichment, theft, and civil conspiracy. (R. 769.) Dozens of similarly situated plaintiffs filed analogous actions against many of the same defendants in California, Florida, Pennsylvania, and Utah. Pursuant to 28 U.S.C. § 1407, the United States Judicial Panel on Multidistrict Litigation consolidated the cases before a single district court. Because Plaintiffs' case was filed earliest, it became the lead case in the newly consolidated litigation.

After years of contentious pretrial proceedings and discovery, Plaintiffs moved for summary judgment on their RICO, fraud, and breach of contract claims. In a comprehensive opinion, the district court granted summary judgment to Plaintiffs on each of the three claims. The court accepted Plaintiffs' damages calculation and determined that their out-of-pocket losses, or "their cash investment less any return," amounted to $16,468,603.87. (R. 2314, at 95.) Because Plaintiffs were entitled to treble damages under RICO, *see* 18 U.S.C. § 1964(c), the district court multiplied these losses by three, to arrive at the figure of $49,405,811.61. The court concluded that prejudgment interest was appropriate and used the Kentucky state statutory interest rate of 8% to award prejudgment interest in the amount of $15,636,273.00.

## DISCUSSION

We review a grant of summary judgment *de novo*, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986) (emphasis in original). "'[T]here must be evidence on which the jury could reasonably find for the' non-moving party." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 252). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## I.     RICO

Plaintiffs' primary claim against Defendants is based on the federal RICO statute, 18 U.S.C. §§ 1961–68. Among other activities, the statute prohibits the following conduct:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To state a claim under this section, a plaintiff must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). RICO defines "racketeering activity" to include numerous so-called predicate acts, including "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1).

To prevent organized crime from "obtaining a foothold in legitimate business," Congress created a civil cause of action for RICO violations. *See Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992). The statute provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains." 18 U.S.C. § 1964(c). In addition to establishing that a given group of defendants conducted the

affairs of a qualifying enterprise through a pattern of racketeering activity, civil RICO plaintiffs must show that the RICO violation was the proximate cause of the injury to their business or property. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

The district court granted summary judgment to Plaintiffs on their RICO claim, finding that Defendants had conducted the affairs of an enterprise through a pattern of racketeering activity in violation of § 1962(c). Defendants raise three distinct challenges to the district court's conclusions. They argue 1) that there are disputed issues of material fact relating to Defendants' intent to defraud; 2) that Plaintiffs did not establish proximate causation; and 3) that Plaintiffs did not establish the existence of a qualifying RICO enterprise. As discussed below, we reject each of these arguments.

### A.    Intent to Defraud

"To establish a substantive RICO violation, a plaintiff must show 'a pattern of racketeering activity.'" *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 795 (6th Cir. 2012) (citing 18 U.S.C. § 1962(c)). Mail fraud and wire fraud are among the enumerated predicate offenses that can constitute "racketeering activity." *See* 18 U.S.C. § 1961(1). The district court found that Defendants committed no fewer than thirty-seven acts that would be indictable as mail and wire fraud. "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises.'" *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (quoting *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)). "A plaintiff must also demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).

Defendants argue that summary judgment was inappropriate because there are disputed issues of fact as to whether they intended to defraud Plaintiffs through the Mare Lease Program. Defendants assert that the district court improperly relied only on

circumstantial evidence to find the requisite intent and disregarded evidence that they lacked knowledge of the fraudulent scheme. Although Defendants correctly posit that "claims involving proof of a defendant's intent seldom lend themselves to summary disposition," *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 218 (6th Cir. 2011), summary judgment is appropriate when the evidence is "so one-sided that no reasonable person could decide the contrary," *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 819 (6th Cir. 1999); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) ("Cases involving state of mind issues are not necessarily inappropriate for summary judgment."). To survive summary judgment, the "mere existence of a scintilla of evidence in support" of a party's position will not suffice. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 576 (6th Cir. 2008) (citing *Anderson*, 477 U.S. at 252).

First, Defendants argue that a genuine factual dispute exists over whether they knew that the mare lease interests were oversold. On the contrary, the evidence clearly established that Defendants operated and marketed the Mare Lease Program with the knowledge that ClassicStar never owned anywhere near the number of Thoroughbreds it purported to lease to investors. ClassicStar, through David and Spencer Plummer, and GeoStar, through Robinson, Ferguson, and Parrott, consistently represented to investors through contracts and promotional materials that the investors would be purchasing interests in actual horses that were owned or leased by ClassicStar. But in reality, ClassicStar owned no more than $56 million worth of mares between 2001 and 2004, even as it was selling an average of $150 million worth of mare leases during each of those years. By the end of 2004, the difference between the value of the mares owned by ClassicStar and the value of the mare leases sold to investors was approximately $270 million.

To disguise the shortfall and convince investors that they were purchasing interests in actual horses, Defendants substituted less valuable quarter-horses for the Thoroughbreds that were supposed to be part of the packages, and in many cases, simply did not name the horses that investors believed they were purchasing. In a cross-claim

against the Plummers, ClassicStar and GeoStar acknowledged that the practice of substituting quarter-horse pairings was part of a fraudulent scheme to disguise the overselling of interests in the Mare Lease Program. (R. 58, ¶¶ 24–32.) The district court considered evidence that Defendants never intended to fulfill the mare lease obligations with these quarter-horses, but rather used them only as placeholders to facilitate fraudulent tax deductions. (*See* R. 1701, Ex. 42.)

The evidence is persuasive that the GeoStar defendants were aware that the Mare Lease Program was dramatically oversold. Defendants argue—as they have throughout this litigation—that the real culprits in the fraudulent scheme were David and Spencer Plummer, both of whom have since pleaded guilty to various federal tax fraud charges. However, the evidence showed that each of the individual defendants was aware of the huge gap between the value of horses owned by ClassicStar and the value of the Mare Lease Program interests being sold to investors. Shane Plummer, another of David Plummer's sons employed by ClassicStar, testified that he discussed the shortfall a number of times with Ferguson, who understood that the quarter-horse pairings were being listed only on paper with the expectation that they would be exchanged for other interests at a later time. (R. 1701, Ex. 30, at 72–84.) Other evidence showed that ClassicStar and GeoStar principals, including Ferguson and Parrott, knew that investors were being assigned nonexistent placeholder horses until they could be convinced to convert their interests into oil and gas programs.

Considering this evidence, no reasonable juror could accept Defendants' argument that the Plummers deceived them and concealed the fact that the Mare Lease Program was drastically oversold. Defendants depict the arrangement between ClassicStar and GeoStar as being at arm's length, with the Plummers operating ClassicStar without the knowledge, input, or control of GeoStar executives. On the contrary, between 2001 and 2004, the chronic shortfall of horses in the Mare Lease Program was a near-constant item of discussion between the Plummers and Ferguson, Robinson, Parrott, and others. In their correspondence, various tactics were suggested to conceal the shortfall from investors, including changing language in the mare lease

agreements to make investors' interests more ambiguous, (R. 1701, Ex. 98, at 3,) and pushing more investors to convert their mare lease interests into Gastar stock, (R. 1701, Ex. 98, at 5.)  Based on this evidence, no reasonable juror could have believed that Defendants were unaware of the overselling of mare lease interests.

Second, Defendants argue that they had no knowledge of the nature of First Equine Energy Partners, or FEEP.  To disguise the fact that ClassicStar did not own enough mares to fulfill its obligations to Mare Lease Program investors, Defendants and the Plummers encouraged the investors to convert their interests in the Program into interests in other companies.  One of these companies was FEEP, an investment vehicle that purported to offer investors oil and gas interests combined with various equine interests.  In reality, however, FEEP existed solely to allow Defendants and the Plummers to move investors out of the oversold Mare Lease Program when they no longer wished to offer shares in their mining companies.  FEEP was never properly funded by GeoStar, and its assets were either small or entirely fictitious.

The uncontroverted evidence submitted by Plaintiffs indicated that neither GeoStar nor its subsidiary, GeoStar Equine Energy, Inc., ever transferred any oil and gas assets to FEEP, even as contrary representations were made to investors.  (R. 1701, Ex. 68; Ex. 71, at 4; Ex. 72.)  Shane Plummer described conversations with Ferguson regarding GeoStar's understanding that investors' quarter-horse interests were not actually being transferred in exchange for interests in FEEP.  (R. 1701, Ex. 30, at 206–07.)  Rather, the abstract "values" associated with the horses were transferred, but the interests in the horses themselves were not, primarily because many of those quarter-horses existed only on paper.  (R. 1701, Ex. 30, at 206–07.)

Contrary to Defendants' protestations, GeoStar executives were intimately involved in the creation and development of FEEP.  Robinson and Parrott helped draft FEEP's private placement memoranda and sat on its advisory committee, and Ferguson was named its tax partner and president of its managing company.  No reasonable juror could conclude that GeoStar and its executives, who were so intimately involved in the creation and management of FEEP, were somehow caught by surprise that FEEP had no

assets.  Defendants clearly participated in the use of FEEP as a vehicle to further conceal their fraudulent overselling of interests in the Mare Lease Program.

Finally, Defendants criticize the district court's use of the circumstantial evidence of GeoStar's financial control of ClassicStar to help establish GeoStar's intent to defraud Plaintiffs.  Defendants again argue that it was ClassicStar and the Plummers who engineered and implemented the Mare Lease Program; GeoStar, according to them, was merely a faraway and unobservant parent.  However, the evidence established that GeoStar exercised considerable control over both the finances and the operations of ClassicStar.  GeoStar executives, including Ferguson, Robinson, and Parrott, were in near-constant communication with the Plummers.  (*See, e.g.*, R. 1701, Ex. 98.)  GeoStar controlled ClassicStar's operating account, which contained virtually all of ClassicStar's funds.  Robinson and Ferguson were co-managers of ClassicStar.  Robinson, as CEO and President of GeoStar, made all fundamental decisions regarding ClassicStar's operations and finances, including its management of the Mare Lease Program.

The district court did not rely on this evidence as the exclusive basis for its finding that Defendants intended to defraud Plaintiffs, but merely referenced GeoStar's considerable operational control over ClassicStar to further undermine Defendants' argument that the ClassicStar fraud was designed and perpetrated only by the Plummers.  Considering the evidence of GeoStar's involvement in the Mare Lease Program, the knowledge of GeoStar executives about the massive overselling of mare lease interests, GeoStar's participation in the creation of FEEP, and GeoStar executives' financial and operational control over ClassicStar, Defendants' assertion that they had no relevant knowledge is thoroughly implausible.  At the very least, Defendants acted recklessly "with respect to potentially misleading information," and no more is required to establish fraudulent intent. *See Heinrich*, 668 F.3d at 404.  Therefore, the district court properly found that Defendants could not establish a genuine dispute regarding their intent to defraud.

### B.     Causation

Defendants next assert that Plaintiffs did not establish proximate causation. Plaintiffs in a civil RICO action must allege and prove that they were "injured in [their] business or property by reason of a violation of [18 U.S.C. § 1962]."  18 U.S.C. § 1964(c).  The Supreme Court has repeatedly held that plaintiffs attempting to assert an injury "by reason of" a RICO violation must demonstrate both but-for causation and proximate causation.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653–54 (2008) (citing *Holmes*, 503 U.S. at 268).  Plaintiffs must show "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.  The Supreme Court has emphasized that this provision, like the RICO statute generally, is to be "liberally construed to effectuate [the statute's] remedial purposes." *Sedima*, 473 U.S. at 498 (quoting Pub. L. No. 91–452, § 904(a), 84 Stat. 947).

Although civil RICO plaintiffs must establish proximate causation, they need not necessarily show that they relied on any misrepresentations.[3]  *See Bridge*, 553 U.S. at 661.  Plaintiffs need only show that the defendants' wrongful conduct was "a substantial and foreseeable cause" of the injury and the relationship between the wrongful conduct and the injury is "logical and not speculative." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004).  Defendants argue that they could not have caused any losses because Plaintiffs were well-aware of various aspects of the Mare Lease Program fraud. Because Plaintiffs were knowing participants in the scheme to obtain fraudulent tax deductions, the argument goes, Defendants' conduct could not have been a "substantial and foreseeable cause" of Plaintiffs' losses.

First, Defendants point to evidence that a number of the Plaintiffs were aware that the Thoroughbreds originally destined for their mare lease packages were being replaced with less valuable quarter-horses. But this knowledge is immaterial. The fraud was predicated on Plaintiffs being misled into believing that the *value* of their mare lease

---

[3]The dissent seems to prefer a standard of causation that would require all RICO plaintiffs to demonstrate reasonable reliance on a defendant's misrepresentations, but the Supreme Court has rejected such a stringent approach, instead demanding only "some direct relation" between the injury and the defendant's conduct. *Holmes*, 503 U.S. at 268.

packages was what they had paid for them; it had nothing to do with the types of horses that were populating the packages. Some of the Plaintiffs undoubtedly were aware that their mare lease packages contained quarter-horses; indeed, one of the Plaintiffs specifically requested quarter-horses. (R. 1815, Ex. 6, at 258.) However, Plaintiffs were never told that the Mare Lease Program did not contain anywhere near enough horses—Thoroughbreds *or* quarter-horses—to fulfill their mare lease packages. There is no genuine dispute that Defendants concealed the massive overselling of mare lease interests.

Second, Defendants assert that Plaintiffs knew of the cozy relationship between ClassicStar and NELC. This knowledge, they say, should have given Plaintiffs notice that the tax deductions were not legitimate. The Tax Code permits the deduction of certain business expenses when the money used in the transaction was obtained through financing, but only when those funds are actually "at risk," meaning either that the taxpayer is personally liable for the repayment of the loan, or the loan is secured by an unrelated piece of property. *See* 26 U.S.C. § 465(b)(2). The Code specifies that funds are not considered at risk if they are borrowed from an entity with an interest in the business activity, a related entity, or a "related person . . . engaged in trades or business under common control." *Id.* § 465(b)(3).

The question is not whether NELC and ClassicStar were actually related entities within the meaning of the Tax Code, thus rendering Plaintiffs' tax deductions improper. The question is whether Plaintiffs *knew* that they would not be personally liable for the loans or that NELC and ClassicStar were related in a way that would disqualify their deductions. Some of the Plaintiffs were indeed aware that NELC and ClassicStar were affiliated in some way, but there was no evidence that any of the Plaintiffs knew that ClassicStar provided all of NELC's funds or that they would not be required to repay their NELC loans. Spencer Plummer told one of the Plaintiff's financial advisors that because his uncle, Gary Thomson (David Plummer's brother-in-law), owned and operated NELC, "we can control him and what he does." (R. 1701, Ex. 7, at 8.) But this

information is not materially related to whether Plaintiffs' funds were "at risk" within the meaning of the Tax Code.

Plaintiffs may have believed that ClassicStar could influence NELC to set favorable loan terms, but they could not have known that NELC was simply a conduit through which ClassicStar funds flowed in a three-way sham transaction. At all times, Defendants referred to NELC as "a national lender on approved credit," (R. 1701, Ex. 9, at 7,) thus concealing its true nature. Furthermore, although some of the Plaintiffs believed that their long-term NELC loans would be repaid with the proceeds of their investments with GeoStar and ClassicStar, (*see* R. 1713, at 5–6,) there is no evidence that any of the Plaintiffs thought their loans would be forgiven altogether. Without some indication that Plaintiffs had knowledge of a fact that would disqualify the tax deductions under the Tax Code's at-risk rules, Defendants cannot establish a genuine issue of material fact on this basis.[4]

Third, Defendants challenge the claim that Plaintiffs were deceived by opinion letters prepared by law firms that had an undisclosed financial relationship with ClassicStar. Defendants argue that those opinion letters did in fact disclose that ClassicStar's law firms, Hanna Strader and Handler Thayer, were to be paid by ClassicStar for preparing the letters. Furthermore, the letters warned that the firms had "a financial incentive for clients to participate" in the Mare Lease Program. (R. 1888, Ex. 4, at 12.) However, both law firms led Plaintiffs to believe that their financial incentives were based on the preparation of opinion letters, when they were actually receiving commissions based on a percentage of Plaintiffs' mare lease purchases. To conceal these incentives from Plaintiffs, Hanna Strader drew up documentation referring to the commissions as "legal fees" instead of "commissions." (R. 1701, Ex. 19, at 78–79.)

---

[4]Although the dissent focuses almost exclusively on the fact that Plaintiffs' tax deductions did not comply with the Tax Code's at-risk rules, it is important to note that the essence of the fraud in this case was the overselling of mare leases and the corresponding lack of economic substance or actual business expenses associated with the Mare Lease Program, two facts that obviously undermine the related tax deductions. (*See* R. 1701, Ex. 9.) There is no evidence that Plaintiffs had any knowledge of these facts.

Because of these misrepresentations and half-truths, Plaintiffs would have had no reason to doubt the legitimacy of their promised tax deductions, and certainly no reason to request an audit of the Mare Lease Program's assets. One of the Plaintiffs, Bryan Nelson, did have Hanna Strader's opinion letter reviewed by KPMG, an outside accounting firm, and that firm raised no red flags about the tax deductions themselves, concluding that it would sign and submit Nelson's tax return. (R. 1815, Ex. 18.) KPMG did recommend that another law firm examine the Program, but only to protect Nelson from the possible imposition of accuracy-related penalties by the IRS, not because it had any doubt about the legitimacy of the Mare Lease Program itself. Defendants presented no evidence that any of the Plaintiffs knew or should have known that ClassicStar's law firms had given advice about the tax treatment of their investments without properly vetting the Program.

Finally, Defendants argue that Plaintiffs knew that FEEP had no assets and was being used merely as a tool for Plaintiffs to pay off their NELC debt. This argument is particularly weak. Plaintiffs do not dispute that they believed the FEEP conversions would provide them an attractive alternative investment to the Mare Lease Program—with additional promised tax benefits. Plaintiffs were also told that the return on their investments in FEEP could be used to pay off their NELC loans. For any such return to materialize, however, Defendants would have had to actually transfer oil and gas interests into FEEP, but they never did so. Plaintiffs could not have known that FEEP owned virtually no assets, nor could they have known that their investments in FEEP would ultimately prove worthless.

Defendants have not established the existence of any disputed issues of material fact with respect to whether their fraudulent conduct was "a substantial and foreseeable cause" of Plaintiffs' losses. Plaintiffs' limited knowledge about various aspects of the fraudulent scheme was largely irrelevant to their decisions to do business with Defendants. Rather, those decisions were proximately caused by numerous and repeated misrepresentations by Defendants and others in which the key pieces of information—the overselling of mare lease interests and the illusory nature of NELC and

FEEP—were never disclosed.  Plaintiffs were undoubtedly engaged in an attempt to take advantage of the arcane and often labyrinthine nature of the U.S. Tax Code, but their project was a lawful one.[5]  The investors could not have known that Defendants were using their interest in tax savings to fraudulently channel money into GeoStar's oil and gas projects.  In the absence of any genuinely disputed issues of material fact, the district court properly found that Defendants' conduct proximately caused Plaintiffs' injuries.

### C.     Existence of a RICO "Enterprise"

Defendants next challenge the existence of a qualifying RICO enterprise.  The RICO statute makes it unlawful for "any person . . . associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  A RICO "person" can be either an individual or a corporation.  *Id.* § 1961(3).  A RICO "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Id.* § 1961(4).  The enterprise itself is not liable for RICO violations; rather, the "persons" who conduct the affairs of the enterprise through a pattern of racketeering activity are liable.  *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1111 (D.C. Cir. 2009).  To establish liability under § 1962(c), a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

This principle is known as the "non-identity" or "distinctness" requirement.  *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 781 (6th Cir. 2000).  "Under RICO, a corporation cannot be both the 'enterprise' and the 'person' conducting or participating in the affairs of that enterprise."  *Id.*  As we explained in *Begala*:

---

[5]The dissent is swayed by what it calls Plaintiffs' greed and their "passion for tax deductions," *see post*, at 32, 33, 37, but a desire for tax deductions is as American as apple pie.  Without material knowledge that they were investing in undervalued or fictitious assets, Plaintiffs cannot be said to have been complicit in the fraud, nor could any reasonable juror dispute the only statutory causation requirement—that Plaintiffs were injured "by reason of" Defendants' pattern of fraudulent conduct. 18 U.S.C. § 1964(c).

> Under the "non-identity" or "distinctness" requirement, a corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members. An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself.

*Id.* If RICO imposed liability on a corporation for the ordinary conduct of its agents and employees, every claim of corporate fraud would automatically become a violation of RICO. *See Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) ("The courts have excluded this far-fetched possibility by holding that an employer and its employees cannot constitute a RICO enterprise.").

The federal courts have encountered significant conceptual difficulties when attempting to apply the distinctness requirement in the context of complex relationships among affiliated and non-affiliated corporations and individuals. *See, e.g.*, *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 747 F.2d 384, 401 (7th Cir. 1984) ("Discussion of this person/enterprise problem under RICO can easily slip into a metaphysical or ontological style of discourse—after all, when is the person truly an entity 'distinct' or 'separate' from the enterprise?"). While all courts agree that a corporation cannot be both a RICO "person" and the "enterprise" whose affairs are conducted by that person, *see Cedric Kushner*, 533 U.S. at 161–62, courts disagree over when and whether a corporate parent can be liable under RICO for participating in an association-in-fact that consists of itself, its owners and employees, and its subsidiaries. *Compare Fitzgerald*, 116 F.3d at 227–28 (finding that the Chrysler Corporation was not a "person" distinct from the "enterprise" consisting of Chrysler and its dealerships and agents) *with Fleischhauer v. Feltner*, 879 F.2d 1290, 1297 (6th Cir. 1989) (finding that an individual and his wholly-owned corporations together constituted an "enterprise").

Plaintiffs alleged that Defendants conducted the affairs of an association-in-fact enterprise, which they label the "ClassicStar Enterprise," consisting of each of the Defendants in this appeal, as well as numerous other entities, including Gastar, the Plummers, and NELC. Plaintiffs assert that this group of corporations and individuals formed an association-in-fact enterprise whose affairs were conducted by each of the

persons who comprised the enterprise, with the goal of funneling investors' money through the Mare Lease Program and into other interests that they controlled. Defendants dispute the existence of an enterprise sufficiently distinct from GeoStar itself. They argue that the associated entities are in reality merely GeoStar's agents and subsidiaries, and therefore that RICO's distinctness requirement cannot be satisfied.

The number of different approaches to the distinctness analysis roughly mirrors the number of cases that have addressed it. The analysis is so fact-intensive that a generic test is difficult to formulate. The cases run the gamut: some consider a parent corporation and its subsidiaries to be distinct from a RICO enterprise if the parent and the subsidiaries play different roles in the scheme, *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993); some ask whether the corporate persons are distinct from the enterprise in the way that RICO envisions, *Fitzgerald*, 116 F.3d at 227; and some require that plaintiffs establish differences in corporate decision-making structures and show businesses sufficiently delineated to justify the conclusion that the alleged RICO activity is not the activity of a single, composite entity, *see Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344–45 (2d Cir. 1994).

Our approach has not been completely clear. In *Fleischhauer v. Feltner*, 879 F.2d 1290 (6th Cir. 1989), we seemed to take into account only whether the corporate defendant "person" was legally distinct from the alleged RICO enterprise. *Id.* at 1296–97. The plaintiff in *Feltner* alleged the existence of an enterprise comprised of a number of companies, all owned by one individual defendant. The defendant argued that because he owned 100% of the corporations, "they were the equivalent of his 'right arm,' with whom he could not 'conspire.'" *Id.* at 1297. We rejected the defendant's argument, finding that "the fact that [the individual defendant] owned 100% of the corporations' shares does not vitiate the fact that these corporations were separate legal entities." *Id.*

In *Davis v. Mutual Life Insurance Co. of New York*, 6 F.3d 367 (6th Cir. 1993), we seemed to take a more functionalist approach. In a scheme vaguely similar to that which was perpetrated by Defendants in this case, an insurance agent named Fletcher,

his insurance agency, and the Mutual Life Insurance Company of New York ("MONY") sold insurance policies by emphasizing the tax advantages that could be realized if certain deductions were taken. *Id.* at 371. After the IRS disallowed these deductions, the investors sued MONY and Fletcher under RICO, alleging that they had acted as RICO "persons" to conduct the affairs of Fletcher's insurance agency as an "enterprise" through a pattern of racketeering activity. *Id.* at 372. MONY argued that the distinctness requirement had not been met because Fletcher and the agency were merely MONY's agents and therefore were indistinct from MONY itself. *Id.* at 377. Rather than asking whether the entities were legally distinct, as we had in *Fletcher*, we evaluated whether they were factually distinct. *Id.* Finding that they were, we found that RICO's distinctness requirement was satisfied, notwithstanding the fact that the agency and Fletcher had acted as MONY's agents. *Id.* at 377–78.

We have not addressed the question of distinctness in the context of corporate relationships since *Davis* was decided in 1993. The law in this area has slowly developed in other circuits, with no clear test or style of analysis emerging. Most courts have rejected the separate-legal-identity theory used in *Feltner*, reasoning that if a corporate defendant can be liable for participating in an enterprise comprised only of its agents—even if those agents are separately incorporated legal entities—then RICO liability will attach to any act of corporate wrong-doing and the statute's distinctness requirement will be rendered meaningless. *See, e.g.*, *Riverwoods*, 30 F.3d at 344 ("Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself.").

In 2001, the Supreme Court seemed to revive the separate-legal-identity theory, if only in the narrow context of a corporation wholly owned by a single individual. In *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), the Court found that the defendant, Don King, was distinct from his wholly-owned corporation for the purposes of RICO. The Court found that because the individual defendant and his corporation were separate legal entities with "different rights and responsibilities," the two were

sufficiently distinct. *See id.* ("[W]e can find nothing in [RICO] that requires more 'separateness' than that.").

Out of the meandering and inconsistent case law from this and other circuits, as well as the Supreme Court's decision in *Cedric Kushner*, two important principles emerge: 1) individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf; and 2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity. Applying these principles in this case reveals that each Defendant is sufficiently distinct from the RICO enterprise to satisfy the statute's distinctness requirement.

### 1.    GeoStar Was Distinct From the Enterprise

Defendants do not challenge the district court's finding that an enterprise did in fact exist, nor could they easily do so given the Supreme Court's repeated admonitions that the term "enterprise," like the RICO statute itself, should be interpreted broadly. *See Boyle v. United States*, 556 U.S. 938, 944 (2009) ("[T]he very concept of an association in fact is expansive."); *Scheidler*, 510 U.S. at 257 ("RICO broadly defines 'enterprise.'"); *Sedima*, 473 U.S. at 497 ("RICO is to be read broadly."). Defendants challenge only the district court's conclusion that the enterprise was distinct from GeoStar itself. Defendants argue that the enterprise consisted only of GeoStar's agents, subsidiaries, and affiliates. Consequently, they claim that GeoStar cannot be liable under RICO because it cannot be both a RICO "person" and the "enterprise" whose affairs are conducted by that person.

Two of the key participants in the enterprise were corporate entities that GeoStar dominated and controlled: Gastar and ClassicStar, LLC. Typically, a parent corporation and its subsidiaries do not satisfy the distinctness requirement because they cannot form an enterprise distinct from the parent. *See, e.g.*, *Riverwoods*, 30 F.3d at 344. However, the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature of its subsidiaries to perpetrate a fraudulent scheme. *See*

*Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 934 (7th Cir. 2003) (finding that a corporate defendant is distinct from an enterprise consisting of itself and its subsidiaries when "the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitate[s] its unlawful activity"); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263–64 (2d Cir. 1995) (finding that related corporations with distinct markets and roles in the scheme were distinct from the RICO enterprise comprised of each of them together). It would be strange indeed to absolve a parent corporation of liability for doing precisely what RICO was designed to prevent: the use of an association of legally distinct entities "as a vehicle through which unlawful . . . activity is committed." *Cedric Kushner*, 533 U.S. at 164 (internal quotation marks omitted).

GeoStar and each of its subsidiaries performed distinct roles that helped facilitate the fraudulent scheme. GeoStar's role was that of an external, financially stable guarantor that stood behind the various conversion opportunities, including FEEP, that were presented to investors to help conceal the overselling of mare lease interests and to encourage the flow of cash through the Mare Lease Program to other investments. According to uncontroverted expert testimony provided by Plaintiffs, ClassicStar's role was to "provide a funding source for GeoStar that was attractive to investors." (R. 1701, Ex. 22, at 11.) Defendants admit that GeoStar brought to the table its traditional business expertise in oil and gas mining, while ClassicStar contributed its expertise in horse breeding. *See* Appellant's Br. 53–54. GeoStar needed the reputation, know how, experience, and legitimacy of the Plummers and ClassicStar in order to entice investors into the Mare Lease Program. Gastar's role was to provide a mechanism for concealing the shortage of horses in the Mare Lease Program by offering investors an alternative investment in the form of publicly traded stock. Because the enterprise successfully carried out its fraudulent scheme by enlisting the participation of GeoStar *and* its separately incorporated subsidiaries, with each playing a key role, we conclude that the enterprise was sufficiently distinct from GeoStar itself.

## 2.     The Enterprise Consisted of More Than Just GeoStar Subsidiaries

Even if GeoStar were not considered distinct from Gastar and ClassicStar, the alleged RICO enterprise was comprised of other entities that were neither owned by GeoStar nor acting as its agents. The key player that falls into this category is NELC, whose owner and sole employee was David Plummer's brother-in-law, Gary Thomson. By facilitating oversized tax deductions, NELC was an important part of the scheme to lure investors into the Mare Lease Program. There is no question that GeoStar neither owned nor directly controlled NELC, even though it obviously influenced its activities through Thomson. NELC's ostensible status as an independent third-party lender was used to convince investors that ClassicStar's financing scheme was legitimate. As with ClassicStar and Gastar, NELC's separate corporate existence and purported independence were key aspects of the fraudulent scheme. On this basis alone, the district court properly concluded that the enterprise and GeoStar were distinct.[6]

Because the district court correctly found that each of the Defendants was distinct from the alleged RICO enterprise, it properly held each of them liable under RICO, either as individually culpable RICO "persons," or by holding the corporations vicariously liable for the RICO violations of their employees. *See Davis*, 6 F.3d at 379–80 (applying standard vicarious liability principles in the RICO context, provided that the corporate defendants are distinct from the RICO enterprise). Defendants have introduced no evidence that would create a genuine dispute about any material facts, and the district court properly concluded that Plaintiffs were entitled to judgment as a matter of law.

---

[6]In its reply brief, Defendants assert that NELC and other unaffiliated entities were not part of the "operation or management" of the enterprise's affairs. However, Defendants misread (or cherry-picked quotes from) our case law to arrive at that conclusion. Following the Supreme Court's decision in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), we have held that a defendant "participates" in an enterprise's affairs "either by making decisions on behalf of the enterprise or by knowingly carrying them out." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008). Given the evidence, no reasonable factfinder could conclude that NELC did not knowingly carry out the enterprise's fraudulent scheme.

## II.     State Law Claims

In addition to violating RICO, Plaintiffs alleged that Defendants are liable under Kentucky state law for fraud and breach of contract.  Plaintiffs argued, and the district court found, that Defendants knowingly misrepresented the nature of the Mare Lease Program and other related investment programs, and that Plaintiffs relied on those fraudulent representations to their detriment, thus satisfying the definition of fraud in Kentucky.  *See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  The district court further found that GeoStar was liable for the breaches of mare lease agreements by ClassicStar—breaches that Defendants apparently do not dispute.  We agree with the district court that Defendants are liable under these common law theories, but we decline to conduct an exhaustive review of these claims because Plaintiffs will be fully compensated by the RICO damages awarded by the district court.  Regardless of the theory of liability, Plaintiffs losses remain the same.  Having upheld the district court's judgment on the RICO claim, any further damages would be duplicative.  *See Best v. Cyrus*, 310 F.3d 932, 936 (6th Cir. 2002) (declining to address an alternative theory of liability after finding in a plaintiff's favor on a parallel theory).

## III.     Prejudgment Interest

We review for an abuse of discretion the district court's decision to award prejudgment interest. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 333 (6th Cir. 2007).  An abuse of discretion arises when the reviewing court is left with the "definite and firm conviction that the trial court committed a clear error of judgment.  A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard."  *United States ex. rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc*., 400 F.3d 428, 450 (6th Cir. 2005).

As a general matter, prejudgment interest is intended to make the plaintiff whole; it "is an element of complete compensation."  *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994) (examining prejudgment interest in the context of Title

VII); *see also Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 376 (6th Cir. 2009) (finding that in the ERISA context, an award of prejudgment interest is "compensatory, not punitive"). There is virtually no Sixth Circuit case law describing the standards for awarding prejudgment interest in the context of RICO. However, when defendants are found liable under other federal statutes like ERISA, we have held that where the statute does not mandate the award of prejudgment interest, "the district court may do so at its discretion in accordance with general equitable principles." *Shelby Cnty. Health Care*, 581 F.3d at 376; *see also Frymire v. Ampex Corp.*, 61 F.3d 757, 774 (2d Cir. 1995) (finding that an award of prejudgment interest for violations of the federal WARN Act should reflect "fundamental considerations of fairness").

The Second Circuit has held that the decision to award prejudgment interest "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3, IBEW, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992). Because prejudgment interest is compensatory in nature, it should not be awarded if it would result in the overcompensation of the plaintiff. *Id.* at 834. "Similarly, prejudgment interest should not be awarded if the statutory obligation on which interest is sought is punitive in nature." *Id.*

Although the Supreme Court has not squarely decided this issue, it has strongly suggested that a treble-damages award under RICO is not punitive in nature. Like treble-damages provisions under the antitrust laws, the damages provision in RICO is "remedial in nature." *PacifiCare Health Sys., Inc. v. Bock*, 538 U.S. 401, 406 (2003) (distinguishing RICO from treble damages under the False Claims Act, which are "essentially punitive in nature"). RICO damages are "designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees." *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 151 (1987). "Although there is some sense in which RICO treble damages are punitive, they are

largely compensatory in the special sense that they ensure that wrongs will be redressed in light of the recognized difficulties of itemizing damages." *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 n.8 (7th Cir. 1987). Because RICO is essentially compensatory in nature, prejudgment interest awards are not categorically inappropriate, as Defendants assert.

Indeed, courts have held that because RICO is essentially compensatory and contains no provision barring prejudgment interest, any such award is within the district court's sound discretion. *See Maiz v. Virani*, 253 F.3d 641, 663 n.15 (11th Cir. 2001); *Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1084 (2d Cir. 1993) (describing the district court's discretion as "broad"). Some courts choose to deny requests for prejudgment interest in cases where plaintiffs already stand to receive treble damages under RICO, reasoning that the trebled damages are sufficient to adequately compensate plaintiffs for their losses. *See, e.g.*, *Bingham v. Zolt*, 810 F. Supp. 100, 101–02 (S.D.N.Y. 1993) (finding that a RICO treble damages award "obviates the need to award prejudgment interest"); *Nu-Life Constr. Corp. v. Bd. of Educ. of N.Y.*, 789 F. Supp. 103, 105 (E.D.N.Y. 1992). Other courts have found such awards are appropriately coupled with treble damages under RICO. *See Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1328 (S.D. Fla. 2009); *D'Orange v. Feely*, 894 F. Supp. 159, 163 (S.D.N.Y. 1995). At least one district court, in a case involving a large and complex financial fraud involving RICO claims and state-law fraud claims, chose to award prejudgment interest on the plaintiffs' state-law claims but not on their federal RICO claim. *See In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1166–67 (E.D.N.Y. 1996). In short, the district court has considerable discretion to fashion a prejudgment interest award in the RICO context.

Prejudgment interest may be particularly appropriate "where treble damages do not adequately compensate a plaintiff for the actual damages suffered, or where a defendant has sought unreasonably and unfairly to delay or obstruct the course of litigation." *Bingham*, 810 F. Supp. at 102. Plaintiffs argue that Defendants did attempt, at virtually every turn, to delay and obstruct the course of this litigation. None of the individual Defendants agreed to offer testimony, instead asserting their Fifth

Amendment rights. They had every right to refuse to testify, of course, but Defendants then denied Plaintiffs other avenues of discovery. For example, the designees of two of GeoStar's subsidiaries were scheduled to be deposed in August 2009. Without any warning, the representatives simply failed to appear on the morning of the deposition, having notified their counsel 45 minutes before that they were unwilling to testify. (*See* R. 1331, at 2.) No explanation was ever offered for this failure.

A particularly egregious example of Defendants' obstruction occurred when GeoStar's designated witness, its accountant William Bolles, failed to appear for the second and third days of his scheduled deposition. (R. 2441, at 2.) Because each of the other GeoStar principals had refused to testify, Bolles' deposition was extremely important to the development of Plaintiffs' case. The district court sanctioned GeoStar for this failure, finding that Plaintiffs' ability to conduct meaningful discovery into GeoStar's conduct was prejudiced as a result. If we were deciding in the first instance whether these discovery abuses warranted an award of prejudgment interest, we may have chosen not to impose them. However, the discretion to award interest is not ours, but the district court's.[7] Because Defendants unfairly delayed the course of litigation and because they provide no strong arguments for why prejudgment interest was inappropriate in this case, the district court did not abuse its "broad discretion" in awarding prejudgment interest to Plaintiffs.[8]

Alternatively, Defendants argue that even if an award of prejudgment interest was appropriate, it should have been calculated at the federal interest rate rather than the much higher Kentucky statutory interest rate of 8%. While it is well-accepted that a federal court sitting in diversity should use the state-law interest rate when awarding

---

[7]Although the dissent suggests that the district court felt compelled to follow Kentucky's rules regarding interest on "liquidated" claims, it seems to us that the court was merely "look[ing] to state law for guidance," just as we have suggested it should do. *See Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998).

[8]Defendants' only argument is that Plaintiffs' out-of-pocket losses should not include their payments on the short-term loans financed by tax refunds that they only received because of their participation in the Program. This argument is more properly directed at the district court's calculation of Plaintiffs' RICO damages, not the decision to award prejudgment interest. Defendants have not challenged the district court's damages calculation in this appeal.

prejudgment interest, *Gentek Bldg. Prods.*, 491 F.3d at 333, a federal court hearing a federal claim should apply federal common law rules, *see Snow v. Aetna Ins. Co.*, 998 F. Supp. 852, 856 (W.D. Tenn. 1998).  Although this may give Defendants some hope, district courts are free to use state law to calculate prejudgment interest even on federal claims.  *See Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998).  We have held that the method for calculating prejudgment interest remains in the discretion of the district courts, and they are free to "look to state law for guidance in determining the appropriate prejudgment interest rate" if they so choose.  *Id.*; *see also Smith v. Am. Int'l Life Assurance Co. of N.Y.*, 50 F.3d 956, 658 (11th Cir. 1995).  *But see Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 150 (2d Cir. 2010) (applying the federal rate to judgments based on combined federal and state claims).

Defendants provide no reason why the Kentucky statutory interest rate would result in overcompensation to Plaintiffs.  *Cf. Ford*, 154 F.3d at 618–19 (finding that the Michigan statutory rate was inappropriate because legislative history showed that it was partially punitive in nature).  As with the district court's decision to impose prejudgment interest, the method for calculating it lies within that court's discretion.  Because of the expansive nature of the fraud in this case and Defendants' unfair obstruction of the pretrial proceedings below, we find that the district court did not abuse its discretion when it awarded prejudgment interest at the Kentucky statutory interest rate.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

MERRITT, Circuit Judge, concurring in part and dissenting in part.

### I. Seventh Amendment Requirements

This case, in which the trial court awarded a summary judgment of $65 million to the plaintiffs, is about the role of judge and jury in a constitutional system requiring that, in civil trials of legal claims in federal court, "the right of trial by jury shall be preserved." U.S. Const. amend. VII.[1] The district court claimed for itself the determination that the defendants caused the plaintiffs $16.5 million in damages—a figure quadrupled to $65 million after application of RICO's treble damages provision and the addition of $15.6 million prejudgment interest—despite substantial evidence that the plaintiffs were themselves at least partly to blame for their losses. Specifically, there is evidence that would allow a reasonable jury to find that the plaintiffs invested not because of the defendants' misrepresentations but rather because of their own greed for tax deductions. The majority now sanctions the district court's error and fails to even discuss the summary judgment and Seventh Amendment issues. The legitimacy of summary judgment ceases when it devolves into "trial by affidavits." It remains a bedrock principle that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

As the Supreme Court long ago explained,

> Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard, the merchant, the mechanic, the farmer, the laborer; these sit together, consult, apply their separate experience of the affairs of life to the facts

---

[1]In full, the Amendment reads, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

> proven, and draw a unanimous conclusion. . . . It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge.

*R.R. Co. v. Stout*, 84 U.S. (17 Wall.) 657, 664 (1874). In keeping with this sentiment, the Supreme Court has continually vindicated the Seventh Amendment against whatever novel procedural device has arisen in the name of efficiency and saving time and effort. "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) (holding additur unconstitutional).[2]

Although the district court intoned the familiar summary judgment standards, its opinion does not evidence any real engagement with the record or with the conflicting inferences that might be drawn from that record. The opinion reads as if the district court had tried the case itself. On the question of damages, in particular, the court simply accepted the plaintiffs' theory of the case because it saves time to avoid a trial. That is impermissible summary-judgment procedure.

I would not object if my colleagues had limited summary judgment to the question of the defendants' fraudulent intent. The defendants failed to call their knowledge into dispute with affidavits, and there is no other evidence to support the defendants' version of events. The inference the defendants suggest—that they knew nothing of the horse fraud—finds no support in the record. The same cannot be said of causation, for there is more than enough evidence to support the conclusion that the plaintiffs were motivated primarily by a passion for tax deductions that the law does not allow. The defendants' misrepresentations were irrelevant, a jury might find. The majority ignores or dismisses evidence that the plaintiffs knew the truth about crucial

---

[2]Many judges and legal scholars have recently complained that federal civil procedure—summary judgment in particular—is deviating more and more from Seventh Amendment standards requiring trial by jury. See Judge Mark Bennett's recent essay on this subject, *From the "No Spittin', No Cussin' and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendant's Summary Judgment Affirmed Without Comment" Days: One Judge's Four-Decade Perspective*, 57 N.Y.L. Sch. L. Rev. 685 (2012–2013).

elements of the mare-lease program. From this evidence a jury might reasonably conclude that the plaintiffs understood or were culpably blind to the illegality of the tax deductions advertised by the defendants. The jury might then further conclude that the plaintiffs were not defrauded, but rather that they invited the transaction as an occasion for colorable tax deductions that the IRS might not investigate. And such a conclusion could justify the jury in denying the plaintiffs a judgment.

## II. The Factual Issues

The important point about the mare-lease program is that it was not a simple exchange of cash for horses. It was primarily about tax breaks. If the plaintiffs knew those tax breaks were bad—whether because of a lack of economic substance or for some other reason—then the causal link between the defendants' actions and the plaintiffs' losses was broken. Though the majority emphasizes that the plaintiffs did not know about the shortfall of horses, that is contested and does not address the major flaws with the tax scheme, the primary reason for the transactions. There are at least four pieces of evidence to support a conclusion that the plaintiffs knew the tax breaks were unsupportable, and that could lead a reasonable jury to find that the plaintiffs' contribution to their losses should bar recovery.

**1.** **Evidence that the plaintiffs knew National Equine Lending was not independent from ClassicStar.** An essential feature of the mare-lease program was its ability to make long-term loans in order to achieve tax-deductible losses for investors. The scheme could hardly be cruder: 1) investor has past income on which he does not wish to pay taxes; 2) investor borrows a sum equivalent to past income; 3) investor uses borrowed funds on horse breeding, thereby creating a farming loss; and 4) investor uses that loss to wipe out past income, thus avoiding taxes. A key tax requirement for this loss-creation mechanism is that the loans come from a lender independent from the corporation to be benefited by the loan proceeds. The loan may not be the risk of a party selling the tax scheme. But there is evidence here that at least two plaintiffs knew National Equine Lending was related to the seller, ClassicStar. Plaintiff Jaswinder Grover understood that ClassicStar "had influence over [National Equine Lending's]

interest rates and could—had an association or affiliate thereof." *See* R. 1714 at 7 n.19. Plaintiff Bryan Nelson of Nelson Breeders testified that he "suspected" National Equine Lending was affiliated with ClassicStar because of "some of the level that all the loans seemed to go through [National Equine Lending], the way there was kind of just a bit of a wink and a nod in terms of, you know, you've got to appear at risk but not really." *See* R. 1713 at 5. Despite knowledge of this flaw that would invalidate a large portion of their tax deductions, the plaintiffs invested anyway. Based on this evidence, a jury could reject the plaintiffs' inconsistent claims that they would not have invested had they known the tax deductions were unsupportable.

The majority does not find this evidence material, because it does not show that "Plaintiffs knew that ClassicStar provided all of [National Equine Lending's] funds or that they would not be required to repay their [National Equine Lending] loans." Op. at 20. But as the plaintiffs' own expert explained, the tax code precludes a taxpayer from deducting the value of a loan—even when he is personally liable on the debt—if the lender is "related" to a corporation to which the loan proceeds will flow. A lender and a corporation are "related" if they are "engaged in trades or business under common control." *See* R. 1701-10 at 41–45 (quoting 26 U.S.C. § 465(c)(3)(C)(ii)). Because independence between lender and beneficiary corporation is required to deduct the value of a loan, it is indeed material that the plaintiffs knew of the relationship between National Equine Lending and ClassicStar.

**2. Evidence that the plaintiffs knew the tax opinions were biased.** The plaintiffs argue that they are not lawyers and that the opinions of established tax attorneys justified their investment. However, the plaintiffs were aware of a financial relationship between ClassicStar and the firms that provided the opinions. The firms disclosed that ClassicStar was paying for the opinions. Handler Thayer was especially explicit, stating that "legal fees received from ClassicStar, LLC increase with each transaction entered into by a client," and that "our firm has a financial incentive for clients to participate." R. 1888-5 at 12. The majority finds it important that the firms did not disclose, in so many words, that ClassicStar was providing them a "commission,"

but disclosed just a payment or fee. The relevance of the distinction between a "fee" and a "commission" in this case escapes me. The plaintiffs knew ClassicStar was paying the firms for the opinions, and they knew the opinions were favorable to ClassicStar's program in every respect. That evidence is surely sufficient for a jury to find that the plaintiffs knew the lawyers were essentially salesmen of the program. It would be reasonable for a jury to infer from this finding that, by relying only on the opinions of compromised attorneys, the plaintiffs did not invest in good faith.

**3. Evidence that one plaintiff willfully ignored advice to seek independent tax counsel.** In addition to not getting independent legal advice, at least one plaintiff was confronted with the inadequate nature of the tax opinions, yet hastened to invest. The defendants entered into the record an internal memo from an accountant at KPMG, plaintiff Nelson's accounting firm. R. 1815-18. This memo assessed the lawyer-salesman's tax opinion and analyzed the probability that, if he took the deduction in reliance on the opinion, Nelson would be assessed a penalty for underpayment of taxes without "reasonable cause," per 26 U.S.C. § 6664. The memo concluded that the opinion financed by the sellers did not assess the specific facts of Nelson's situation and that it appeared to be a "promoter" opinion. Nelson's accountant advised that he disclose the mare-lease investment to the IRS or obtain a second, fact-based opinion in order to ensure that there was reasonable cause for the deduction. Nelson rejected the advice and "indicated that after consultation with his [promoter] attorneys that he wanted to proceed without disclosing the treatment in his tax return, he would not engage [Hanna Strader] to issue an updated opinion, and he would not engage another law firm to get a second opinion letter." *Id.* at 5. From this evidence that Nelson relied on a "promoter" opinion to take an unreasonable tax deduction, the jury could conclude that Nelson caused his own harm.

**4. Evidence that the plaintiffs continued to invest despite knowing the defendants had an insufficient number of thoroughbreds.** The plaintiffs knew the defendants were giving them quarter horses instead of the promised thoroughbreds. No one disputes that, except the majority which states in footnote 4 that "there is no

evidence that Plaintiffs had any knowledge of these facts," *i.e.*, "the overselling of mare leases." Yet the plaintiffs continued to invest in the mare-lease program and in some instances reinvested. Their willingness to stick with the defendants regardless of whether they delivered the program's main profit-making asset could lead a jury reasonably to conclude that the plaintiffs were primarily concerned with tax deductions rather than horse breeding. While the quarter-horse substitution may be immaterial to the question of whether the plaintiffs knew of the program's undercapitalization (as the majority asserts), it is material to the plaintiffs' state of mind, which in turn reaches the issue of causation. A jury could conclude that the plaintiffs intended to take tax breaks regardless of the investments' underlying substance. This conclusion, along with the other evidence, could justify a finding that the plaintiffs' overriding intention to avoid taxes was the real cause of their losses.

In sum, when the evidence is viewed collectively, a colorable version of events favorable to the defendants' argument on causation emerges. In this scenario, the plaintiffs knew their tax attorneys were selling them a scheme, knew they were not receiving a full complement of thoroughbred foals for racing or sale, knew that the company from which they were taking long-term loans was an arm of ClassicStar in violation of the risk requirements of the tax law, and refused to seek independent counsel on the validity of their tax deductions. Despite the warning signs, the plaintiffs plunged headlong into the mare-lease program for the tax breaks, heedless of whether those breaks had any legal basis. In this scenario, the cause of the plaintiffs' losses was not the defendants' fraud but the plaintiffs' greed. Perhaps a jury would agree with the version of events that the plaintiffs, the district court, and my colleagues spin. But there is a reasonable basis in the record for the alternative conclusion, and that is all that is required for the defendants to survive summary judgment. The defendants should be permitted an attempt to persuade a jury that the plaintiffs caused their own injuries. On this record, that is what the Seventh Amendment demands.

### III.  The Prejudgment Interest Award

Given this conclusion, I would vacate the entirety of the $65 million damages and remand the case for trial, as the Seventh Amendment requires.  But even if I believed summary judgment for the plaintiffs were warranted, I would vacate the $15.6 million prejudgment interest.  Assuming for the sake of argument that prejudgment interest should ever be awarded on top of statutory treble damages, the district court's award was erroneous under the circumstances.  The majority correctly explains that federal law is used to determine prejudgment interest on a federal claim such as RICO, but it fails to acknowledge that the district court did not apply federal law.  The district court imposed the state statutory interest rate of eight percent after determining the plaintiffs' damages were "liquidated" under Kentucky law.  But whether damages are "liquidated"—a term that Kentucky apparently applies beyond the normal situation of contractual stipulation—is irrelevant under federal law.  Under federal law, whether to award prejudgment interest is a matter of equity guided by the need to ensure full compensation, to avoid overcompensation, and to achieve fairness. *See Blau v. Lehman*, 368 U.S. 403, 414 (1962); *Rodgers v. United States*, 332 U.S. 371, 373 (1947).  While a federal court may consult state law as part of its equitable inquiry, it is manifest error for the court to ignore federal law altogether and to mechanically apply a state statutory rate or a state "liquidated damages" penalty.  The majority suggests some rationales by which the district court might have concluded that prejudgment interest at the Kentucky statutory rate was fair, but the district court did not actually rely on those rationales in its opinion.  Proper concern for federal equitable standards might have caused the district court to decline to pile $15 million prejudgment interest on top of $16 million actual damages that had already been trebled.