# United States Court of Appeals
## For the First Circuit

No. 11-1772

LOUIS FERNANDES,

Plaintiff, Appellant,

v.

AGAR SUPPLY COMPANY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

J. Michael Conley, with whom Kenney & Conley, P.C. was on brief, for appellant.
Joseph T. Black, with whom Law Offices of Brown & Black was on brief, for appellee.

July 30, 2012

**LYNCH**, **Chief Judge**.  In this personal injury action, Louis Fernandes sued AGAR Supply Company, Inc., for negligence in federal district court under diversity jurisdiction.  Fernandes, a resident of Rhode Island, injured his back when he stepped into a hole in the floor of a tire "shed" which was on property leased by AGAR, a Massachusetts corporation, to Fernandes's employer, Penske Truck Leasing.  Whatever remedies Fernandes may have against Penske, he sued AGAR on the theory that it owed him a duty of care to maintain and repair the tire "shed" under the lease between AGAR and Penske.  The district court granted summary judgment to AGAR on the duty of care issue under Massachusetts law, relying on Humphrey v. Byron, 850 N.E.2d 1044 (Mass. 2006).  See Fernandes v. AGAR Supply Co., Inc., No. 09-10930, 2011 WL 2266537 (D. Mass. June 7, 2011).  We affirm.

## I.

We view the facts in the light most favorable to the party opposing summary judgment, Fernandes.  Guay v. Burack, 677 F.3d 10, 13 (1st Cir. 2012).

We put the word "shed" in quotation marks in the opening paragraph because it is not a conventional shed.  Rather, the tire shed in which Fernandes suffered his back injury was an old shipping container.  It was located near, but separate from, a garage building in Taunton, Massachusetts, that Penske leased from AGAR.  AGAR had previously been located in Boston, and, while

-2-

there, its maintenance personnel had used the same container to store their tools and later to store tires. When AGAR moved its operations to Taunton in 2001, it brought the container along and placed it on the property for use as tire storage.

Shortly after moving to Taunton, AGAR entered into an agreement with a company called AMI Leasing for the leasing and maintenance of tractor trailers. The agreement also stated that AGAR would provide to AMI a lease on a "shop facility" located on its Taunton property. This lease does not define "shop facility," nor does it mention the tire shed or a container. In 2004, after AMI had taken over the Taunton garage and continued to use the container for tire storage, Penske acquired AMI and became the tenant under the same lease.[1]

Under the lease, Penske occupied the garage while AGAR retained access to only limited facilities: a wash bay located at one end of the garage and separated from the repair shop in the garage by a cinder block wall. The lease at paragraph 29 obligated AGAR to maintain and repair certain components of "the garage":

> AGAR shall, at is [sic] expense, maintain, repair and replace as necessary the roof, walls, overhead doors, all structural components, oil/water separator, electrical, plumbing, and boiler/furnace issues in the garage, except for repairs occasioned by the

---

[1] For clarity, we will refer to both AMI and Penske as "Penske," because that company was the tenant under the lease at the time of Fernandes's injury.

> negligence of [Penske].  [Penske] agrees to
> pay cost of utilities for the garage.

AGAR employed custodial and maintenance personnel, while Penske did not.

For purposes of its motion for summary judgment, AGAR conceded that it was the owner of the tire shed.  Penske's use of the tire shed was based on its lease of the shop facility.  Penske had placed a lock on the tire shed and had not given a key to AGAR. The only copies of the key were kept in the garage's service office, which was used exclusively by Penske.  AGAR never used, inspected, maintained, or repaired the tire shed during Penske's lease of the shop facility.

Penske's service manager, Vincent Boschetti, was aware before Fernandes's accident that the tire shed's floor was in an unsafe condition.  The roof of the container was rotted, and the water that leaked in had softened the floor and created two or three holes, each about eleven by seven inches in size.  Several Penkse employees, including Fernandes, had complained to Boschetti about the holes in the floor.  Boschetti had attempted to repair the floor himself. When that did not work, he brought his concerns to his superior at Penske, who told him that Penske would not pay for any repairs to the tire shed and that he should instead talk to AGAR.  AGAR likewise told Boschetti that it would not spend any money to repair the floor.

At the time of his injury, Fernandes had been employed as a technician by Penske for about three years, doing heavy duty truck maintenance and repairs at the Taunton facility. He was injured at about 3:00 A.M. on December 7, 2007, while working the overnight shift. The tire shed had no lights, so Fernandes was using a flashlight. In the course of moving the third of four truck tires, which had been covering a known hole in the floor, Fernandes stepped in the hole, losing his balance and wrenching his back in an attempt to keep from falling. Fernandes was aware of the hole, having seen it at least six to eight times before his injury and stumbling into it at least twice. After Fernandes's injury, Penske arranged for the removal of the tire shed. Penske then entered into a separate lease agreement with another company for a replacement container, which was also placed on AGAR's Taunton property.

On June 3, 2009, Fernandes filed his complaint in the district court alleging negligence against AGAR. This is a timely appeal from entry of summary judgment in favor of AGAR.

## II.

Our review is de novo, Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 70 (1st Cir. 2011), and we apply Massachusetts law, as agreed by the parties. This case turns on the interpretation of a lease which, in the end, is a question of law. "The existence of a legal duty is a question of law appropriate for resolution by

summary judgment." Afarian v. Mass. Elec. Co., 866 N.E.2d 901, 905 (Mass. 2007). Fernandes's claim for negligence against AGAR only lies if it can be established that a duty flowed to him from AGAR under the commercial lease. See Remy v. MacDonald, 801 N.E.2d 260, 262 (Mass. 2004).

This case is, as the district court recognized, controlled by the decision of the Massachusetts Supreme Judicial Court (SJC) in Humphrey v. Byron. Humphrey recognized a difference as to duty of care owed by lessors between leases of residential property and leases of commercial property. 850 N.E.2d at 1048. The SJC commented that the incentives to make repairs to avoid injuries differed in the two situations. Even small commercial tenants "would have an incentive to make repairs, for example, to avoid workers' compensation claims and to maintain an orderly and productive business without injuries to employees or customers. A small commercial tenant, unlike a residential tenant, could also regard repair expenses as a cost of doing business and raise prices accordingly." Id. at 1049.

Humphrey sets forth the circumstances in which a lessor of commercial property owes a duty of care to persons on the leased property:

> [A] lessor of commercial premises is liable in tort for personal injuries only if either (1) he contracted to make repairs and made them negligently, or (2) the defect that caused the injury was in a 'common area,' or other area

-6-

> appurtenant to the leased area, over which the
> lessor had some control.

Id. at 1049 (quoting Chausse v. Coz, 540 N.E.2d 667, 668 (Mass. 1989)) (internal quotation marks omitted). By its terms, the second prong of the Humphrey test applies only where the injury-causing defect was in an area outside the "leased area" but "over which the lessor had some control." This accords with Massachusetts case law, which "recognizes a distinction between the leased premises themselves and 'common' or 'appurtenant' areas outside the leased premises, such that ordinarily, the tenant is responsible for the leased premises and the landlord, perhaps jointly with the tenant, is responsible for common or appurtenant areas." Id.

Both parties agree that the tire shed, although not specifically mentioned in the lease, was conveyed by AGAR to Penske by the lease and so was part of the "leased area." The only issue before us is "the interpretation of the lease relative to AGAR's contractual duty to repair" under the first prong of the test in Humphrey.[2] If our examination of the lease reveals no contractual

---

[2] Fernandes concedes that on this record there is no "need to evaluate the parties' right of control" of the tire shed under the second prong of the test in Humphrey v. Byron, 850 N.E.2d 1044, 1049 (Mass. 2006). Fernandes was correct to make this concession. The tire shed was used exclusively by Penske. After AGAR conveyed the premises to Penske by the lease, Penske put a lock on the container and AGAR never received a copy of the key or otherwise had access to the container. The undisputed facts show that AGAR retained no control.

undertaking by AGAR to repair the tire shed, then the duty of care remains only with Penske, and Fernandes's negligence claim against AGAR fails. See Sheehan v. El Johnan, Inc., 650 N.E.2d 819, 820 (Mass. App. Ct. 1995) ("If a [commercial] tenant . . . occupies the entire premises -- i.e., there are no areas used in common with other tenants -- then the tenant is responsible for keeping the premises safe, absent a contractual undertaking to the contrary by the landlord.").

The interpretation of a lease contract is a question of law. Lumber Mut. Ins. Co. v. Zoltek Corp., 647 N.E.2d 395, 396 (Mass. 1995). If the terms of the lease are unambiguous, we interpret it according to its plain terms, and "[s]ummary judgment is appropriate when those plain terms unambiguously favor either side." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011).

The only provision of the lease between AGAR and Penske which discusses maintenance and repair is paragraph 29, which states in pertinent part that "AGAR shall . . . maintain, repair and replace as necessary the roof, walls, overhead doors, all structural components, oil/water separator, electrical, plumbing, and boiler/furnace issues in the garage" (emphasis added). Neither this provision nor any other provision in the lease specifically uses the term "tire shed" or refers to a container. Paragraph 29

provides for the maintenance and repair of the garage and for no other structure on the Taunton premises.

Fernandes argues that the phrase "garage" in paragraph 29 should be read to include the free-standing tire shed. He argues that the word "garage" as used in the lease refers not only to the garage building on the Taunton property, but also to the entire leased premises, including both the garage building and the tire shed.

But paragraph 29 by its terms applies only to the structural elements of and the amenities "in the garage." There is no dispute that the tire shed was located outside of and separate from the garage building. To interpret AGAR's repair obligation to include the tire shed would contravene the plain language of the lease.

The ordinary meaning of "garage" also works against Fernandes. "Garage" is defined as "a building or component of a building used for housing an automotive vehicle" and as "a repair shop for automotive vehicles." Webster's Third New International Dictionary 935 (1993). Neither of these definitions cover this tire shed: a container used to store tires that has never been used to house or repair vehicles.[3]

_____

[3] In analyzing the same dictionary definition of "garage" in an unrelated area of law, the SJC has noted that "[t]he one certain meaning of the word 'garage' in the aforementioned definition is that it must be a 'building.'" Fitz-Inn Auto Parks, Inc. v. Comm'r of Labor & Indus., 213 N.E.2d 245, 247 (Mass. 1965) (citing

A lessor of commercial property has no obligation to make repairs to that property unless he or she contracts to do so, see Humphrey, 850 N.E.2d at 1049, and the parties to the lease are free to limit the scope of the lessor's contractual repair obligations by specifying which portions of the leased property the lessor is to maintain and repair.

Fernandes's fallback argument is that two other provisions in the lease -- paragraphs 26 and 27 -- should lead us to interpret the term "garage" as used in paragraph 29 to refer to the entirety of the leased property, including the tire shed. Paragraph 26 states that Penske, "on paying the rent, shall have quiet enjoyment of the garage." Paragraph 27 states that Penske "shall have and hold the garage until" the separate vehicle lease agreement between the parties is terminated. Fernandes argues that because the lease states that Penske would "have quiet enjoyment of the garage" and would "have and hold the garage," the term "garage" as used throughout the lease, including the repair obligation in paragraph 29, must be read to be coterminous with the entire leased premises. We do not agree. The "quiet enjoyment" and "have and hold" provisions are separate obligations from the repair provision.

---

Webster's New International Dictionary (2d ed. 1956)). The tire shed here is merely a container: it is not a "repair shop," and it is not a "building."

-10-

The lease did not obligate AGAR to maintain or repair the tire shed, so Fernandes cannot hold AGAR liable under the test set out by the SJC in <u>Humphrey</u>.

### III.

We hold that under Massachusetts law, AGAR owed no duty of care to Fernandes, so his negligence claim must fail.

The district court's decision is <u>affirmed</u>.