## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## EAGLEEYE ASSET MANAGEMENT, LLC, and Jeffrey A. Liskov, Defendants.

**Civil Action No. 11–11576–WGY.**

United States District Court, D. Massachusetts.

Oct. 4, 2013.

---

Deena R. Bernstein, Martin F. Healey, Naomi J. Sevilla, U.S. Securities & Exchange Commission, Boston, MA, for Plaintiff.

Jennifer Mikels, Albert P. Zabin, Duane Morris LLP, Boston, MA, for Defendants.

*MEMORANDUM*

YOUNG, District Judge.

## I. INTRODUCTION

This case illustrates the value of a jury trial in an adjudicatory system apparently devoted almost entirely to efficiency. Its broad outlines are briefly limned. The well-prepared plaintiff brought a motion for summary judgment. Its outcome was all but a foregone conclusion and it was supported by a decision in this district in closely analogous circumstances. This Court denied summary judgment. A costly and inefficient (at least compared to summary judgment) nine-day jury trial ensued. The jury returned a carefully nuanced verdict that necessarily addressed and resolved an issue that transcends in significance the dispute between these particular parties. I would argue that this is the proper procedural course.[1] Others

---

1. I have long argued that the federal judiciary's single minded emphasis on efficiency tends to marginalize the American Jury, supplant other, more important values, and that more comprehensive measures of district court activity are needed today. *See United States v. Massachusetts*, 781 F.Supp.2d 1, 23–25 (D.Mass.2011) (citing Patrick E. Higginbotham, *The Present Plight of the United States District Courts*, 60 Duke L.J. 745, 747 (2010)); *see also* Leonard Post, *Federal Tort Trials Continue a Downward Spiral*, Nat'l L.J., Aug. 22, 2005; Patrick E. Higginbotham, *Judge Robert A. Ainsworth, Jr. Memorial Lecture, Loyola University School of Law: So Why Do We Call Them Trial Courts?*, 55 S.M.U. L.Rev. 1405, 1405–06 (2002). It is for this reason that I have, for the past four years, published a ranking of America's most productive federal district courts. *See* William G. Young & Jordan M. Singer, *Bench Presence: Toward a More Complete Model of Federal District Court Productivity*, 118 Penn St. L.Rev. (forthcoming Fall 2013), *available at* http://ssrn.com/abstract=2246875. I am not alone in these concerns. *See* Joseph F. Anderson, Jr., *Where Have You Gone, Spot Mozingo? A Trial Judge's Lament Over the Demise of the Civil Jury Trial*, 4 Fed. Cts. L.Rev. 99, 105 (2010); Victor E. Schwartz & Leah Lorber, *A Letter to the Nation's Trial Judges: How the Focus on Efficiency Is Hurting You and Innocent Victims in Asbestos Liability Cases*, 24 Am. J. Trial Advoc. 247, 249 (2000).

> The irony here is that the new palaces of steel and glass [courthouses] arrive at the point where the courts actually empty out in favor of the devolution of adjucative function to the bureaucratic back offices. The courtrooms have the transparency of the void, while the offices thrum and vibrate to the energies of privatized Justice—the antidemocracy of multiple forms of Alternative Dispute Resolution where only the protagonists engage while the public is shut out. In a parallel development, increasing concerns with security engender both barriers to participation in standard courts and special courts, such as in Guantanamo, that denigrate completely the notion of public participation and with it the safeguards to justice that such participation developed to ensure. Such courts are the particularly sharp edge of less visible but cognate domestic processes, both criminal and civil, which close off avenues to public participation (for example, commercial contracts that include terms requiring that disputes be resolved by private arbitration). Only in certain enlightened spaces is there sign of the successful blending of image and process, marked by the recognition of the violence of judgment, but also, in balance, the price paid in suffering for the possibility of this democratic form of violence to have been achieved and thus a constant reminder of the possibilities of injustice.... The danger is that such rare examples of "iconography for democratic adjudication" become lost in the welter of self-congratulatory edifices to transparency that provide a front operation to the back-housing of adjudication-as-administration.

Eugene McNamee, *Review of Judith Resnik & Dennis Curtis, Representing Justice: Invention, Controversy, and Rights in City–States and Democratic Courtrooms*, 25 Law & Literature 131, 137 (2013).

It need not be this way. "[T]he jury is worth fighting for." Jennifer Walker Elrod, *Is the Jury Still Out?: A Case for the Continued Viability of the American Jury*, 44 Tex. Tech. L.Rev. 303, 303 (2012).

Judge D. Brock Hornby recently and provocatively pondered how a reality television show might depict a federal trial court

may disagree.[2] The facts speak for themselves.

## II. BACKGROUND

On September 8, 2011, the Securities and Exchange Commission (the "SEC") brought this civil complaint against EagleEye Asset Management, LLC ("EagleEye") and Jeffrey A. Liskov ("Liskov").[3] Compl., ECF No. 1. The SEC alleged that Liskov violated section 10(b) of the Securities Exchange Act of 1934 ("section 10(b)" of the "Exchange Act"), 15 U.S.C. § 78j(b), and rule 10b–5 thereunder ("rule 10b–5"), 17 C.F.R. § 240.10b–5, that he violated sections 206(1) and 206(2) of the Investment Advisers Act ("section 206(1)" and "section 206(2)" of the "Advisers Act"), 15 U.S.C. §§ 80b–6(1), (2), and that he violated Section 204 of the Advisers Act, 15 U.S.C. § 80b–4, and Rules 204–2(a)(1)–(6) and 204–2(a)(8) thereunder, 17 C.F.R. §§ 275.204–2(a)(1)–(6), (8). *See*

Compl. ¶¶ 63–93. The SEC requested that this Court permanently enjoin Liskov from engaging in such conduct, require Liskov to disgorge ill-gotten gains, and order him to pay a penalty. *See id.* ¶¶ A–C.

On June 15, 2012, the SEC moved for summary judgment. SEC's Mot. Summ. J., ECF No. 26; SEC's Mem. Law Supp. Mot. Summ. J. ("SEC's Mem."), ECF No. 27; Pl. SEC's Local R. 56.1 Statement Undisputed Material Facts ("SEC's Statement"), ECF No. 28. Liskov opposed the motion while denying many of the SEC's allegations. Defs.' Br. Opp'n Pl.'s Mot. Summ. J. ("Liskov's Opp'n"), ECF No. 45; Mot. Defs. Leave File Corrected Counter Statement Facts Dispute, Attach., Counter Statement Defs. Liskov & EagleEye Asset Mgm't LLC, Pursuant Local R. 56.1 (Corrected), ECF No. 37. The Court heard oral argument on September 19, 2012, and denied summary judgment. Tr. Mot. Hr'g, Sept. 19, 2012, ECF No. 54.

judge today. He envisioned that the judge would be in an office in business attire, spending most of her time pounding away on a keyboard. His vision suggested a person tethered to the computer and all but cut off from the parties and their lawyers—a virtual judge, practically invisible. He was not describing a ratings hit or a show that critics would praise.

That may describe the days of some federal trial judges, but it does not describe their fate. It is not the immutable destiny of judges that they must vanish from sight and sound. It is certainly not the case that in order to assume the role of active case manager a judge must retreat into his or her chambers never to be seen again. Properly understood, active case management creates opportunities for judges to reconnect with the litigating public. Throughout the pretrial process, judges can conduct "live" proceedings in which they do not vanish but instead reappear. And as an added bonus, we think judges who manage their cases well will have yet another opportunity to reappear: at the trials they can sometimes foster by avoiding the crippling costs that drive parties who would like to

go to trial to settle instead. That's a reality we'd like to see.

Steven S. Gensler & Lee H. Rosenthal, *The Reappearing Judge*, 61 U. Kan. L.Rev. 849, 874–75 (2013) (citing D. Brock Hornby, *The Business of the U.S. District Courts*, 10 Green Bag 2d 453, 463 (2010)). *See* D. Nev. Short Tr. Rules, *available at* http://www.nvd.uscourts.gov/Files/USDC%20Short%20Trial%20Rules.pdf; Stephen D. Susman & Thomas M. Melsheimer, *Trial by Agreement: How Trial Lawyers Hold the Key to Improving Jury Trials in Civil Cases*, 32 Rev. Litig. 431 (2013).

2. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 484–88 (6th Cir.2013), discussed *infra* at n. 9.

3. While the corporation, EagleEye, is legally distinct from Liskov, Liskov was its only officer, manager, and employee. *See* Compl. ¶ 13, ECF No. 1; Answer Defs. ¶ 13, ECF No. 7. As such, all acts performed by the corporation were in reality carried out by its sole officer, Liskov. To simplify things, this memorandum will attribute all actions to Liskov because distinguishing actions he performed as an officer is unnecessary.

The case proceeded to a nine-day jury trial, held between November 5, 2012, and November 26, 2012. Elec. Clerk's Notes, Nov. 5, 2012, ECF No. 75; Elec. Clerk's Notes, Nov. 26, 2012, ECF No. 110. The jury found that Liskov had, as to various victims, intentionally or recklessly misrepresented material facts in violation of the Advisers Act, had fraudulently misrepresented material facts with intent to deceive in connection with the sale of a security, in violation of the Exchange Act, had violated the Exchange Act by fraudulently failing, in connection with the sale of a security, to disclose his forex[4] trading record, and had intentionally engaged in a scheme to defraud in connection with the sale of a security, in violation of the Exchange Act. *See* Jury Verdict, ECF No. 111.

At the end of an oral hearing held December 11, 2012, regarding remedies, this Court imposed an order including a permanent injunction, disgorgement, and fines. *See* Hearing Tr. 30:9–31:1, Dec. 11, 2012, ECF No. 125. This order was memorialized in a final judgment as to both defendants the following day. Final Judg-

ment Both Defs., ECF No. 124. This order completed proceedings, and the case was terminated on December 13, 2012.

This memorandum explicates three useful and necessary things. First, this Court will explain its view on the use of summary judgment and on why it denied summary judgment in this case (necessitating the nine-day trial) despite the overwhelming evidence proffered at that stage by the SEC. Second, the Court wishes to alert those regulated by the Exchange Act of the most significant implication of the jury verdict here. Finally, it is only fitting that the Court explain its reasoning for selecting the final judgment imposed in this case.

## III. ANALYSIS

### A. Despite Overwhelming Supporting Evidence, Summary Judgment for the SEC Was Inappropriate Where the Burden Is on the SEC to Prove Scienter or Negligence

Summary judgment is overused across our courts.[5] *See* Mark W. Bennett, *From*

---

4. Forex is simply an acronym for "foreign exchange." Forex trading is the exchange of foreign currencies, facilitated by private platforms set-up as markets for such exchanges. Forex trading involves significant risk. *See* Trial Tr., Vol. 1, 78:21–79:2, Nov. 5, 2012, ECF No. 83.

5. Federal judges frequently bemoan the time involved in wrestling with "meritless" motions for summary judgment, yet a recent study shows that of the motions for summary judgment filed in response to certain federally based employment discrimination claims disposed of by the District of Massachusetts between January 1, 2011, and December 31, 2011, 57% of them were granted in full, 29% were granted in part and denied in part, and 14% were denied entirely. *See* Stephanie Mills & Jenna Zellmer, *The Unique Obstacles Employment Discrimination Plaintiffs Face in Pre–Trial Motion Practice* 20, 27 fig. 2 (May 8, 2013) (unpublished manuscript) (on file with the Social Law Library), *available at* http://

www.socialaw.com/slbook/judgeyoung13/ Mills 20& 20Zellmer 20– 20Final 20Paper 20.2..pdf. Attorneys move for summary judgment for one reason and one reason only. In a significant number of cases, the motion works and trial is avoided.

Small wonder that, over the past eight years, the average American has seen his or her chance of serving on the nation's juries diminish by nearly a third (32.54% to be exact). Statistics maintained by the Administrative Office of the United States Courts show that the percentage likelihood of being selected for federal petit jury service has been steadily declining over the past decade. *Compare* Admin. Office U.S. Courts, *2011 Annual Report of the Director: Judicial Business of the United States Courts* 326 tbl. J–2 (2012), *available at* http://www.uscourts.gov/uscourts/ Statistics/JudicialBusiness/2011/Judicial Business2011.pdf *with* Admin. Office U.S. Courts, *2004 Annual Report of the* Director: Judicial Business of the United States Courts 325

the "No Spittin', No Cussin', and No Summary Judgment" Days of Employment Discrimination Litigation to the "Defendants' Summary Judgment Affirmed Without Comment" Days: One Judge's Four–Decade Perspective, 57 N.Y.L. Sch. L.Rev. 685, 686 (2012–2013); Arthur R. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U. L.Rev. 982, 1133 (2003); Patricia Wald, Summary Judgment at Sixty, 76 Tex. L.Rev. 1897, 1898 (1998) ("[S]ummary judgment has assumed a much larger role ... than its traditional image portrays or even than the text of Rule 56 would indicate, to the point where fundamental judgments about the value of trials and especially trials by jury may be at stake."); see also Suja A. Thomas, Why Summary Judgment Is Unconstitutional, 93 Va. L.Rev. 139, 139–40 (2007). But see Edward Brunet, Summary Judgment Is Constitutional, 93 Iowa L.Rev. 1625 (2008). Summary judgment is appropriate only where the materials in the record show that there is "no genuine dispute as to any material fact". Fed.R.Civ.P. 56(a). When ruling on a summary judgment motion, the trial court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. Pineda v.

Toomey, 533 F.3d 50, 53 (1st Cir.2008). If there is a sufficient evidentiary basis on which the trier of fact could find for the nonmoving party, then a genuine issue of fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The measure of materiality is whether the "material" fact will affect the outcome of the case under the applicable law. See id. at 248, 106 S.Ct. 2505. The burden is on the moving party to show that no genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Because our justice system leaves credibility determinations for a jury, not a judge, see Anderson, 477 U.S. at 255, 106 S.Ct. 2505, when reviewing the record, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Courts may base grants of summary judgment only on facts admitted by both parties and must disregard all evidence, even if unopposed, which the jury is free to reject. Courts cannot grant summary judgment on an issue on which the moving party bears the burden if the moving party relies on evidence that the jury could disbelieve even where the nonmoving party has presented no contrary evidence.[6]

tbl.J–2 (2005), available at http://www.uscourts.gov/uscourts/Statistics/Judicial Business/2004/appendices/j2.pdf. This Court calculated an average American's chance of serving on a federal petit jury by taking the number of individuals who gave jury service, and dividing that number by the number of individuals in the United States who are over the age of eighteen. The former number was gleaned from the Administrative Conference reports cited above, the latter from the Census Bureau.

6. This Court acknowledges the apparent tension between the Supreme Court's reasoning in Reeves and Federal Rule of Civil Procedure 56(e), which provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ..., the court may .... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed.R.Civ.P. 56(e)(3). Yet this ostensible inconsistency can be squared by the presence of the word "may" in Rule 56(e)—reserving to courts some measure of discretion in the reso-

This Court adheres meticulously to the standard set forth in *Reeves*, where the Supreme Court reviewed the Fifth Circuit's reversal of a jury verdict in an age discrimination case. *Id.* at 139–140, 120 S.Ct. 2097. That "case consist[ed] exclusively of a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." *Id.* at 137, 120 S.Ct. 2097. A jury, disbelieving the defendant's explanation for the termination, found it liable. *See id.* at 138–39, 120 S.Ct. 2097.

While *Reeves* focused on the standard for judgment as matter of law, the Supreme Court made clear that it was basing its decision on the standard for granting summary judgment. *See id.* at 150, 120 S.Ct. 2097 (noting that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (quoting *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505)).

Where differences between these two standards occur, the standard for granting summary judgment is more exacting than the standard for granting judgment as matter of law. After all, judgment as matter of law comes after a trial allowing the impeachment of evidence while nonmoving parties do not have the full ability to impeach testimony before the summary judgment stage. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). Thus, while in *Reeves* the Supreme Court stated that courts should credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the

extent that that evidence comes from disinterested witnesses," 530 U.S. at 151, 120 S.Ct. 2097 (internal quotation marks omitted) (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, p. 300 (2d ed.1995)), at summary judgment, courts must ignore even uncontradicted evidence from disinterested witnesses where there is some question whether this evidence may be impeached.

In the present case, the SEC moved for offensive summary judgment. Thus, the burden of proof for all elements of all claims was on the SEC.

■ Claims under section 10(b) and rule 10b–5 have six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance by investors; (5) economic loss; and (6) loss causation. *Mississippi Pub. Emps.' Ret. Sys. v. Bos. Scientific Corp.*, 649 F.3d 5, 20 (1st Cir.2011); *see also Crowell v. Ionics, Inc.*, 343 F.Supp.2d 1, 12 (D.Mass.2004) (quoting *In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 52 (D.Mass.1998) (Lasker, J.)) (providing five elements by combining "economic loss" and "loss causation" into a single "resultant injury" element).

Section 206 of the Advisers Act establishes fiduciary duties owed by investment advisers to their clients. *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). The Act makes it:

unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or

lution of summary judgment motions—and by the rule's strict requirement that the movant actually be entitled to such relief—a require-

ment that cannot be met under *Reeves* where the movant bears the burden of proof.

course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. §§ 80b–6(1), (2). The differing language in section 206(1)—"to employ"—as compared to section 206(2)—"to engage"—is reflected in the varying intentionality required—scienter is required under section 206(1) while merely negligent conduct can violate section 206(2). *See Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir.1979), *aff'd*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) (discussing and citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)).

Thus, to prove any of its central claims [7] under either the Exchange Act or the Advisers Act, the SEC had to prove either the requisite scienter or a breach of a duty sufficient for a finding of negligence. Both of these are questions best left to a jury.

 The necessary scienter is a mental state "embracing [an] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To prove scienter, a plaintiff must show "either a conscious intent to defraud or a high degree of recklessness." *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir.2008) (internal quotation marks omitted) (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir.2008)).

 In attempting to demonstrate the requisite scienter, the SEC relied primarily on Liskov's deposition and documentary evidence. *See* SEC's Mem. 11–14. The SEC's evidence was certainly strong. It had documents forged by Liskov that au-

thorized money transfers among his clients' accounts. *See Id.* at 11; SEC's ¶ Statement 231; *Id.*, Ex. 1, Def. Jeffrey Liskov Respons. Pl. Sec. & Exch. Comm. First Set Req. Admis. ("Liskov Admis.") 10–11, ECF No. 28–1. These money transfers appeared to be attempts by Liskov to cover his trading losses. Liskov appeared to mislead his clients regarding the losses. Moreover, Liskov admitted that he used white-out to create the altered documents, that he did not have specific authorization from the victims to make the transfers, and that he was sloppy. *See* Liskov Admis. at 3–6.

Liskov claimed that while he did not have specific authorization, he did have general permission from the victims to transfer money among their accounts and that his doing so through altered documents, while sloppy, was not intended to defraud. *See* Liskov's Opp'n 11–12. As such, Liskov admitted to the acts, but denied the requisite scienter.

The SEC argued that no reasonable jury could look at what Liskov had admitted—the repeated use of white-out to transfer money without authorization along with misleading statements about the success of investments—and conclude anything but that Liskov intended to defraud the victims. *See* SEC's Mem. 11–2; Tr. Mot. Hr'g 3:23–25.

This Court disagreed and continues to do so. Liskov did not admit to the requisite scienter. Such a scienter is up to the jury to infer. The evidence points in that direction, but the jury is free to disbelieve the victims (who are certainly not disinter-

---

7. The SEC also claimed that Liskov violated Section 204 of the Advisers Act, 15 U.S.C. § 80b–4, and Rules 204–2(a)(1)–(6) and 204–2(a)(8), thereunder, 17 C.F.R. §§ 275.204–2(a)(1)–(6), (8). See Compl. ¶¶ 82–93. This claim regards violation of reporting require-

ments as an investment adviser. Such claim did not appear to be important to either the SEC or Liskov. As such, it was not even presented to the jury and is not of much moment for this analysis.

ested witnesses) and believe that Liskov indeed had general authorization to transfer client funds as he saw fit. Perhaps doing so through whiting-out and altering documents was more than clumsy (and a violation of fiduciary duties), but it may not have been the requisite scienter for finding a violation of section 10(b) of the Exchange Act, rule 10b–5, or section 206(1) of the Advisers Act.

Interestingly, after it became clear that this Court would not grant summary judgment as to any counts requiring scienter, *see* Tr. Mot. Hr'g 3:21–22 ("as to those [counts] that require scienter[,] [Liskov is] entitled to a trial on that, isn't he?", the Court asked); *see also id.* at 5:8 ("On scienter I have real problems", the Court observed), the SEC argued that the Court should find a violation of section 206(2) of the Advisers Act because only negligence must be shown, *id.* at 7:17–21. The SEC argued that Liskov admitted to negligence by virtue of admitting that he was sloppy, unwise, and took shortcuts. *See id.* at 7:24–8:7. This Court disagreed, pointing out that whether negligence has occurred must be a question for a jury. *Id.* at 7:22–23.

In the end, the jury found that Liskov did not "make negligent misrepresentations of material fact in violation of the Investment Advisers Act." *See* Jury Verdict 1.a. One could speculate that the jury, quite reasonably, rejected Liskov's testimony that he was merely sloppy, finding instead that he had acted intentionally. Had this Court granted summary judgment for the SEC on the negligence counts, it would have made a grave mistake, as the jury reasonably concluded no negligence occurred in this case.

Similarly, this Court would have been incorrect to have granted summary judgment on the counts requiring scienter. A jury reasonably could have concluded that Liskov did not intend to defraud his clients, but, while having no intent to defraud, was extremely sloppy, took shortcuts by altering old documents rather than getting new authorizations from clients, and violated a slew of fiduciary duties. Few things seem more appropriately the province of a jury than the inference of a defendant's mental state. Without admissions by a defendant that he intended to defraud, it is hard to imagine a situation in which a court can grant offensive summary judgment where such scienter is a required element. *But see SEC v. Druffner,* 517 F.Supp.2d 502, 509 (D.Mass.2007) (Gorton, J.)(granting summary judgment for the SEC in a case requiring scienter by determining that the circumstantial evidence of scienter is "sufficiently potent to establish fraudulent intent beyond hope of contradiction") (quotation mark omitted) (quoting *In re Varrasso,* 37 F.3d 760, 764 (1st Cir.1994)), *aff'd sub nom. SEC v. Ficken,* 546 F.3d 45 (1st Cir.2008).

Too often, judges substitute their own judgment for that of the jury. These judges decide that no reasonable juror could view the evidence in a manner different from the judge's own conclusion.[8] This cognitive illiberalism has been rightly condemned as a form of judicial arrogance. *See* Dan M. Kahan et al., *Whose Eyes Are You Going to Believe? Scott v. Harris and the Perils of Cognitive Illiberalism,* 122 Harv. L.Rev. 837, 896–99 (2009).

Juries have not only the duty, but also the right to decide cases. Encroaching upon the province of juries to decide questions of fact, such as the determination of a

---

**8.** I am myself guilty of this institutional (and unconstitutional) hubris. *Sensing v. Outback Steakhouse of Fla., Inc.,* 566 F.Supp.2d 24 (D.Mass.2008), *rev'd* 575 F.3d 145 (1st Cir. 2009).

defendant's state of mind, violates not only the constitutional rights of the parties in a suit, but also the constitutional rights of the jurors themselves.[9] *See* Andrew Guthrie Ferguson, *The Jury as Constitutional Identity*, U.C. Davis L.Rev. (forthcoming) (manuscript at 4), *available at* http://ssrn.com/abstract=2222158.

## B. Failing to Disclose One's Forex Trading Record Can Be a Violation of the Exchange Act

Throughout these proceedings, the SEC was determined to argue that Liskov should have disclosed his track record in forex trading. *See, e.g.,* SEC's Mem. 10. The SEC contended that such a disclosure was material because Liskov had previously lost thousands of his own dollars and much more in client funds in trading in forex and that future clients would not have invested with Liskov in forex had they known of these losses. *See id.*

Liskov disagreed. He argued that his training as a broker-dealer for Fidelity Brokerage Services had taught him not to disclose his personal trading track record. Liskov's Opp'n 19. Moreover, the SEC had considered precisely such a rule—requiring brokers to disclose their track records—but had rejected it. As such, Liskov argued that as matter of law, he had no duty to disclose the losses he suffered in the past to future customers. *Id.* at 19–20.

■ Having repeatedly heard these arguments, this Court was frustrated by both parties' imprecision. The question of "duty" is indeed matter of law. *See Fernandes v. AGAR Supply Co., Inc.,* 687 F.3d 39, 42 (1st Cir.2012) ("The existence of a legal duty is a question of law appropriate for resolution by summary judgment." (quoting *Afarian v. Mass. Elec. Co.,* 449 Mass. 257, 261, 866 N.E.2d 901 (2007))). There is no doubt in this case that Liskov had a fiduciary duty to his clients. The scope of that duty, however, is a question of what a reasonable broker-dealer fiduciary in the position of Liskov would do. As with most questions of reasonableness, it is up to the jury to determine whether Liskov breached his fiduciary duties by failing to inform his clients of his track record in forex. The proper standard of care is for a jury to decide. Nor is the jury bound by the SEC's indecision or the standards and practices of the securities industry. Those considerations bring to mind the case of *The T.J. Hooper,* 60 F.2d 737 (2d Cir.1932), which every first-year law student ought study in torts. In that case, two barges towed by two tugboats were lost in a storm. *Id.* at 737. The trial judge found that the tugboats were unseaworthy because they failed to have radios which would have alerted them to the storm and possibly led them to seek shelter and avoid the loss of the barges. *Id.* Judge Learned Hand, writing for the panel, ruled that even though it was not the common practice of tugs to carry radio receiving sets,[10] failure to carry receiving

---

9. *Contra In re ClassicStar Mare Lease Litig.,* 727 F.3d 473, the mirror image of this case—in everything but the result. There too the plaintiff—which bore the burden of proof—brought a strong motion for summary judgment. There too "[t]he defendants failed to call their knowledge into dispute with affidavits, and there is no other evidence to support the defendants' version of events." *Id.* at 498 (Merritt, J., concurring in part and dissenting in part). "On the question of damages, in particular, the [district] court simply accepted the plaintiffs' theory of the case because it saves time to avoid a trial." *Id.* The result? Summary judgment for the plaintiff in the amount of $65,000,000 affirmed 2–1. *See Id.* at 478–79. Neither opinion cites *Reeves* or acknowledges its teaching. Perhaps I am missing something.

10. There was also no law requiring tugs to carry radio receiving sets. *Id.* at 740.

sets could be, and in this case was, properly found to be a breach of the tugs' owners' duty to safeguard the barges and cargo. *See id.* at 740. He famously reasoned:

> Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

*Id.*[11] While Liskov may claim that he was trained not to disclose his track record, while he may assert that not discussing one's track record is an industry practice, and while he may even point to the lack of a rule adopted by the SEC to require disclosing one's track record, none of these declarations absolve him of his duty or ensure that he has satisfied that duty. Judge Hand spoke of courts declaring what is required while reviewing a judge's finding in an admiralty case, *id.*, but it is typically juries who determine the standard of proper diligence, *see Texas & P. Ry. Co. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 (1903) (Holmes, J.) (holding that a jury may find that compliance with industry practices violates a standard of "reasonable prudence").

For these reasons, this Court put the question to the jury: "Did Mr. Liskov violate the Securities Exchange Act of 1934 by fraudulently failing, in connection with the sale of a security, to disclose his forex trading record to [his clients]?" Jury Verdict, Question 3.b. The jury answered in the affirmative as to four clients. *Id.* The jury was convinced that by failing to disclose his forex track record, Liskov had acted fraudulently, violating his fiduciary duties to clients and the Exchange Act.

The American jury makes a profound contribution to the very structure and fabric of American law, *Ciulla v. Rigny*, 89 F.Supp.2d 97, 98 (D.Mass.2000), and so it is here. Indeed, this particular case would be of little interest to anyone other than the litigants were it not for the remarkable role of the American jury. According to this federal jury, a broker-dealer who fails to disclose his poor forex trading record to clients, where knowledge of such a record may influence whether they choose to invest in forex with him managing that investment, violates his fiduciary duties and the Exchange Act. Since this jury determined that a broker-dealer who fraudulently has failed to disclose his poor forex trading record has violated the Exchange Act, other broker-dealers should now be on notice that such a failure by them could lead to the same finding. This important jury finding is as much "the law" as it would be were this Court to have made the same finding in a jury-waived case. No longer can the securities industry simply advance the SEC's equivocation or its own internal procedures as the standard against which its conduct should be measured. Why? An American jury has said so.[12]

---

11. I have a personal partiality to the case of *The T.J. Hooper*. Charlie Bolster, my old friend and colleague on the Massachusetts Superior Court, represented the interests of the owners of the barges' cargo.

12. Ironically, were I to have reached this same conclusion as a judge, my opinion would rapidly find its way into electronic databases that are fully word searchable. Why? Because we are eager to trace how the "law" is developing. A jury verdict, on the other hand, is archived only on "pathetic PACER", *Enwonwu v. Chertoff*, 376 F.Supp.2d 42, 82 n. 34 (D.Mass.2005) (quoting Letter from Hon. William G. Young to Hon. John W. Lungstrum (June 9, 2005)) (internal quotation

## C. Sanction is justified

Along with the jury's verdict that Liskov violated section 206(1) of the Advisers Act, section 10(b) of the Exchange Act, and rule 10b–5, thereunder, the Court ruled that Liskov violated Section 204 of the Advisers Act, 15 U.S.C. § 80b–4, and Rules 204–2(a)(6) and 204–2(a)(8) promulgated thereunder, 17 C.F.R. §§ 275.204–2(a)(1)–(6), (8), concerning a registered investment adviser's obligations to keep true, accurate, and current books and records, *see* Final Judgment Both Defs. 1.[13]

This Court imposed sanctions reflective of the relief the SEC sought. The Court permanently enjoined Liskov and his agents from violating the recordkeeping requirements of the Advisers Act, section 10(b) of the Exchange Act, and Rule 10b–5 promulgated thereunder, and sections 206(1) and (2) of the Advisers Act. *See id.* at 1–2. The Court also ordered disgorgement of ill-gotten profits. *See id.* at 2. The SEC proved that the ill-gotten profits based on only those victims as to whom Liskov was found liable [14] totaled $301,502.26. The Court also ordered Liskov to pay prejudgment interest in the amount of $29,603.59 as authorized by statute to prevent a form of unjust enrichment in Liskov possessing for a significant period of time these ill-gotten gains without paying the requisite interest. *See* Hearing Tr. 9:10–10:9, Dec. 11, 2012, ECF No. 125; Final Judgment Both Defs. 2.

Finally, the Court ordered a civil penalty: "EagleEye and Liskov are *severally* liable for civil penalties in the amount of $725,000 *each* pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b–9(e)." Final Judgment Both Defs. 3. The Court deemed this an appropriate civil penalty for a host of reasons.

This penalty properly reflects the seriousness of the offense. Here, Liskov repeatedly transferred client funds without their authorization. He used white-out to alter documents. He used these forged documents to transfer vast sums of client money from other investments into a highly speculative market that he was quite literally addicted to playing—the way a gambler may be addicted to playing craps. These actions, according to the jury, were part of an *intentional* scheme to defraud four of his clients. The clients, particularly, Patricia Stott and Judith Starrett, lost significant sums of money as a result, with losses for all victims totaling in the millions of dollars.

Moreover, Liskov's conduct clearly violated multiple fiduciary duties. Liskov had a duty to protect, advise, and guide his

---

marks omitted), the federal courts' virtually unsearchable and thus impenetrable internal database. This is but another example how we in the judiciary ourselves institutionally marginalize our constitutional partners in adjudication. Jurors are as much constitutional officers as are we, U.S. Const., art. III, § 2, cl. 3 (criminal cases), *id.*, Amend. VII (civil cases). Indeed, when applying the law to the facts they have found, jurors are supreme. Their verdicts are an even more important indicia of legal development as they come from the people themselves, a transparent expression of direct democracy.

I wrote this opinion primarily to rescue this important jury verdict from oblivion. This ought not be necessary.

**13.** The parties had agreed to submit this last count of the SEC's complaint to the Court rather than to the jury.

**14.** Liskov was found not liable as to his dealings with Stephen Bodi, *see* Jury Verdict, and the disgorgement fees sought by the SEC properly excluded any funds Liskov earned as a result of his work for Stephen Bodi, *see* Hearing Tr. 9:6–8, Dec. 11, 2012, ECF No. 125.

clients, helping them avoid the pitfalls of investing. Instead, he defrauded them to fuel his own obsession with forex trading, and, as a result, he lost significant sums of his clients' funds.

The Court has also taken into account Liskov's present inability to pay and the impact such a civil penalty will have on him and his family; still, a significant penalty is appropriate due to the seriousness of the conduct at issue.

The SEC requested a civil penalty of $725,000 against EagleEye and $840,000 against Liskov. *See* SEC's Post Trial Br. 1–2, ECF No. 119. This Court views the conduct of one and the other as equivalent because there is no way to distinguish the individual persona from the corporate one. As such, the interests of justice demand that the penalty be identical for both the corporate body and the individual. Thus, the $725,000 civil penalties assessed severally against each Liskov and EagleEye properly reflect the seriousness of the conduct, the mitigating factors, and the interests of justice.

## IV. CONCLUSION

For the foregoing reasons, this Court denied the motion for summary judgment on September 19, 2012, ECF No. 51, and, on December 12, 2012, imposed its final order, ECF No. 124.